**AUTOCEPHALOUS GREEK–ORTHO-DOX CHURCH OF CYPRUS and The Republic of Cyprus, Plaintiffs,**

**v.**

**GOLDBERG & FELDMAN FINE ARTS, INC., and Peg Goldberg, Defendants.**

**No. IP 89–304–C.**

United States District Court, S.D. Indiana, Indianapolis Division.

Aug. 3, 1989.

---

John David Hoover and Sally F. Zweig, Johnson, Smith, Densborn, Wright & Heath, Indianapolis, Ind., and Thomas R. Kline, Thomas E. Starnes, Douglas E. Lavin and June L. Walton, Manatt, Phelps, Rothenberg & Phillips, Washington, D.C., for plaintiffs.

Joe C. Emerson and Joseph H. Yeager, Jr., Baker & Daniels, and Ezra H. Friedlander, Friedlander & Kirsh, Indianapolis, Ind., for defendants.

## MEMORANDUM OF DECISION AND ORDER

NOLAND, District Judge.

### *Summary of Decision*

In this case the Court is asked to decide the right of possession as between the plaintiffs, the Autocephalous Greek–Orthodox Church of Cyprus ("Church of Cyprus") and the Republic of Cyprus, and the defendants, Peg Goldberg ("Goldberg") and Goldberg & Feldman Fine Arts, Inc., of four Byzantine mosaics created in the early sixth century. The mosaics, made of small chips of colored glass, were originally affixed to and for centuries remained in a church in Cyprus, a small island in the Mediterranean. In 1974, Turkish military forces invaded Cyprus and seized control of northern Cyprus, including the region where the church is located. At some point in the latter 1970s, during the Turkish military occupation of northern Cyprus, the mosaics were removed from their hallowed sanctuary. The plaintiffs claim that the Church of Cyprus has never intended to relinquish ownership of the mosaics, that

the mosaics were improperly removed without the authorization of the Church or the Republic of Cyprus, and that the mosaics should be returned to the Church. The defendants, on the other hand, claim that export of the mosaics was authorized by Turkish Cypriot officials, and that in any event Goldberg should be awarded the mosaics because she purchased them in good faith and without information or reasonable notice that they were stolen. Having heard and reviewed all the evidence in the case, the Court concludes that possession of the mosaics must be awarded to the plaintiff, the Autocephalous Greek–Orthodox Church of Cyprus.

The Court concludes that because the place where the mosaics were purchased, Switzerland, has an insignificant relationship to this suit, and because Indiana has greater contacts and a more significant relationship to this suit, the substantive law of the state of Indiana should apply to this case. Under Indiana law, a thief obtains no title to or right to possession of stolen items. Therefore, a thief cannot pass any right of ownership of stolen items to subsequent purchasers. Because the mosaics were stolen from the rightful owner, the Church of Cyprus, Goldberg never obtained title to or right to possession of the mosaics. Under this analysis of Indiana law, it is unnecessary to consider whether Goldberg exercised good faith or due diligence in obtaining possession of the mosaics.

In the alternative, the Court considers the issues under Swiss law. Under Swiss law, in certain situations a thief may sell and pass good title to stolen items to a good faith purchaser. Whether one qualifies as a good faith purchaser is determined by evaluating certain factors. These factors are evaluated to determine whether the purchaser knew that the seller lacked title, or whether an honest and careful purchaser would have had doubts with respect to the seller's capacity to transfer property rights, and if so, then whether the purchaser reasonably inquired about the seller's ability to pass good title. Evaluating those factors under the facts of this case, the Court concludes that Goldberg is not a good faith purchaser under Swiss law. This is so because suspicious circumstances surrounded the sale of the mosaics which should have caused an honest and reasonably prudent purchaser in Goldberg's position to doubt whether the seller had the capacity to convey property rights, and because she failed to conduct a reasonable inquiry to resolve that doubt.

Therefore, principally under Indiana law and alternatively under Swiss law, Goldberg never obtained good title to or the right to possession of the mosaics. The Church of Cyprus, the original and rightful owner of the mosaics, has requested and made a proper showing for the return of the mosaics. The mosaics are unique. The paramount significance of their existence is as part of the religious, artistic, and cultural heritage of the Church and the government of Cyprus, and as a part of the national unity of the Republic of Cyprus. Therefore, the Court orders that possession of the mosaics is awarded to the plaintiff, the Autocephalous Greek–Orthodox Church of Cyprus.

### Memorandum of Decision

Trial of this action was to the Court on May 30 through June 6, 1989. This Memorandum of Decision is entered in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, which allows findings of fact and conclusions of law to appear in a memorandum of decision filed by the court.

### I. Procedural History

The plaintiffs filed their complaint in this suit on March 29, 1989. On March 31, 1989, the parties entered into an "Agreed Order," which was approved and signed by this Court on that same date. Pursuant to the terms of the Agreed Order, the plaintiffs posted a security bond in the amount of $150,000, and the defendants in turn agreed not to take any "action to alter, destroy, sell, or transfer possession of the four Kanakaria mosaics" identified in the plaintiffs' complaint. In their Agreed Order, the parties also agreed to a trial date of May 30, 1989. The defendants filed their answer on April 19, 1989.

On May 24, 1989, the Turkish Republic of Northern Cyprus ("TRNC") filed a "Motion to Intervene as Plaintiff." A hearing on TRNC's motion to intervene was held by this Court on May 30, 1989. By order dated May 30, 1989, this Court denied TRNC's motion to intervene and also denied TRNC's motion to stay the trial (which was scheduled to start that same day) pending appeal of the denial to intervene.

Before trial the issue of money damages was separated from this case. Thus, the only issue presently before the Court is who is entitled to possession of the mosaics.

From May 30, 1989, through June 6, 1989, a bench trial was held by this Court. The parties agreed to submit post trial briefs in lieu of closing arguments; those briefs were filed with this Court on July 11, 1989. Finally, by joint stipulation dated June 27, 1989, the parties agreed to extend the March 31st Agreed Order until August 15, 1989.

## II. *Jurisdiction*

This Court has original jurisdiction over the subject matter of this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a). Plaintiff the Republic of Cyprus is a sovereign nation located on the island of Cyprus in the Mediterranean Sea.[1] Plaintiff Autocephalous Greek–Orthodox Church of Cyprus is a religious organization with its principal offices in Nicosia, Cyprus. Defendant Goldberg & Feldman Fine Arts, Inc. is a corporation organized and existing under the laws of the state of Indiana, with its principal place of business in Carmel, Indiana. Defendant Peg Goldberg is a citizen of the state of Indiana. The amount in controversy in this case exceeds the sum of $10,000, exclusive of interest and costs.

Venue is proper in the United States District Court for the Southern District of Indiana pursuant to 28 U.S.C. § 1391(a).

## III. *Historical Setting and Factual Background*

The facts established by the evidence presented are as follows.

### A. The Mosaics of the Church of the Panagia Kanakaria

This case involves a dispute as to the ownership of four Byzantine mosaics. These four mosaics were originally part of a larger mosaic ("the original mosaic"). The original mosaic was affixed to the apse of the Church of the Panagia Kanakaria ("Kanakaria Church") in the village of Lythrankomi, Cyprus, in 530 A.D. Except for a unique quirk of fate, the original mosaic would have ceased to exist a thousand or more years ago. During the period of Iconoclasm (roughly the 8th century), government edicts mandated the destruction of religious artifacts so that such religious "images" would not be the subject of veneration. These iconoclast edicts were responsible for the destruction of many significant religious artifacts. The original Kanakaria mosaic is one of only six or seven Byzantine mosaics to survive the ravages of Iconoclasm and the passage of time.

The original Kanakaria mosaic depicted Jesus as a young boy seated in the lap of his mother, the Virgin Mary, who sat on a throne surrounded by a mandorla of light. The figures of Jesus and the Virgin Mary were bordered on each side by depictions of two archangels. This central composition was in turn bordered by a frieze containing

---

1. The Court notes that the defendants have raised the issue of whether plaintiff the Republic of Cyprus has standing to maintain this suit. In the complaint, the plaintiff Republic of Cyprus alleges that the Republic and its citizens "have a recognized and legally cognizable interest in the four Kanakaria mosaics, and in protecting and preserving them as invaluable expressions of the cultural, religious and artistic heritage of Cyprus." Complaint, ¶ 40. Without extended discussion, the Court concludes that plaintiff the Republic of Cyprus has a legally cognizable interest in the mosaics sufficient to confer standing. *See, e.g., United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

Both the Republic and the Church of Cyprus request that the mosaics be returned to the Church of Cyprus. The Court has concluded that the Church of Cyprus is entitled to possession of the mosaics. The Court need not address further the Republic of Cyprus's standing.

the busts of the twelve apostles. The original mosaic was made of small pieces of colored glass referred to in the art world as tesserae.

As stated previously, the original mosaic was affixed to the apse of the Kanakaria Church in the early sixth century. Over the centuries, the mosaic has deteriorated. By 1960, all that remained of the original Kanakaria mosaic was the figure of Jesus, the bust of the North Archangel, and nine of the twelve apostles. Between 1959 and 1967, the mosaic was cleaned and restored ....der the sponsorship of the Department of Antiquities of the Republic of Cyprus, the Church of Cyprus, and Harvard University's Dumbarton Oaks Center for Byzantine Studies. With the knowledge gained in its efforts to restore the mosaic, Dumbarton Oaks published an authoritative volume on the Kanakaria Church and its art: *The Church of the Panagia Kanakaria at Lythrankomi in Cyprus: Its Mosaics and Frescoes*, authored by A.H.S. Megaw and E.J.W. Hawkins (1977).

The four mosaics at issue in this case were once a part of the original Kanakaria mosaic. These four mosaics depict the figure of Jesus as a young boy and the busts of the North Archangel, the apostle Matthew, and the apostle James. Each of the four mosaics measures approximately two feet by two feet. 

This brief background enables one to understand the origin of the four mosaics at issue in this case and their invaluable and irreplaceable significance to Cyprus's cultural, artistic, and religious heritage. Had it not been for an unusual series of events, these four mosaics would probably have remained in the Kanakaria Church to this day—undisturbed in their deteriorating but readily recognizable state.

B. The Partition of Cyprus

Cyprus is an island located in the Mediterranean. The island covers 3,572 square miles and is smaller than the state of Connecticut. The population of Cyprus is approximately 696,000. The Cypriot population is comprised mainly of persons of either Greek or Turkish descent. Today, approximately 79 percent of the population is made up of persons of Greek descent, and approximately 18 percent of the population is made up of persons of Turkish descent. Historically, Greek Cypriots follow the Greek Orthodox faith; Turkish Cypriots follow the Muslim faith.

Cyprus was a British colony from 1878 to 1960, at which time it became an independent republic. In 1963, civil disturbances broke out between Greek Cypriots and Turkish Cypriots. United Nations peacekeeping forces were sent to Cyprus to restore order in 1964. The U.N. forces have remained in Cyprus ever since.

On July 20, 1974, Turkish military forces invaded Cyprus. Turkish troops landed on the north coast of Cyprus and advanced to Nicosia. By late August, the Turkish forces had extended their control over the northern 37 percent of the island. This region has remained under Turkish military occupation since the invasion.

After the invasion, the Turkish military established in essence a puppet government in northern Cyprus called the "Autonomous Cyprus Turkish Administration." That government was succeeded in February 1975 by the "Turkish Federated State of Cyprus." In 1983, the Turkish Federated State of Cyprus was succeeded by the "Turkish Republic of Northern Cyprus." The Turkish Republic of Northern Cyprus is recognized as a legitimate government by only one nation in the world: Turkey. It is not recognized, nor has it ever been recognized, by the United States government. The United States government recognizes only the plaintiff Republic of Cyprus as the legitimate government of all the people of Cyprus.

The Kanakaria Church is located in the village of Lythrankomi, which is in an area of northern Cyprus now under Turkish military occupation. After the 1974 invasion, the Greek Cypriot population of Lythrankomi was "enclaved" by Turkish military forces. During this time the Greek Cypriots were denied many basic human rights, including freedom of movement, medical care, and the ability to earn a living. Many men from the village were arrested and

detained in Turkish jails; there they received severe beatings by Turkish soldiers.

Despite the hardships that fell on the Greek Cypriot parishioners of the Kanakaria Church, religious services continued to be conducted in that church on a regular basis. In July 1976, the pastor of the Kanakaria Church, Father Antomis Christopher, was forced to flee to non-occupied southern Cyprus for fear of his life. The church itself was not physically damaged between the invasion in July 1974 and Father Christopher's departure in July 1976. By the end of 1976, all Greek Cypriots in Lythrankomi had vacated the village and had relocated to southern Cyprus, which is controlled by the plaintiff Republic of Cyprus. Their departure from northern Cyprus was not voluntary.

## C. The Theft of the Mosaics

Since the 1974 Turkish invasion, the government of the Republic of Cyprus and the Church of Cyprus have generally been denied access to occupied northern Cyprus.

However, since that time they have received reports from persons in the occupied area that several churches and national monuments have been looted and destroyed and that many mosaics, frescoes, and icons in those churches and national monuments have been stolen or destroyed.[2] When Father Christopher fled occupied northern Cyprus in July 1976, the mosaics were still intact and affixed to the apse of the Kanakaria Church. Sometime between August 1976 and October 1979, the interior of the Kanakaria Church was vandalized and the mosaics were forcibly removed from the apse of the church. The mosaics were severely damaged during their removal. Neither the Republic of Cyprus nor the Church of Cyprus has ever authorized the removal or sale of the Kanakaria mosaics.[3]

## D. Cyprus's Efforts to Recover the Mosaics

As previously noted, since the Turkish invasion in 1974, the Republic of Cyprus has learned of the theft or destruction of

**2.** Cyprus is not alone in suffering great losses to its cultural property during times of war. During World War II, many nations suffered such losses. In response to the widespread theft and destruction of cultural property during World War II, the United Nations Educational, Scientific and Cultural Organization ("UNESCO") convened an international conference at The Hague in 1954. The conference was held "for the purpose of drawing up and adopting a Convention for the Protection of Cultural Property in the Event of Armed Conflict" ("the Hague Convention"). *Final Act of the Intergovernmental Conference on the Protection of Cultural Property in the Event of Armed Conflict, The Hague, 1954.* The nations participating in the conference agreed "to take all possible steps to protect cultural property" because they were "convinced that damage to cultural property belonging to any people whatsoever means damage to the cultural heritage of all mankind ...[,] that the preservation of cultural heritage is of great importance for all peoples of the world[,] and that it is important that this heritage should receive international protection." *Id.*

In the early 1970s, the Sixteenth General Conference of UNESCO adopted "The Convention on the Means of Prohibiting and Preventing the Illicit Import, Export and Transfer of Ownership of Cultural Property" ("the UNESCO Convention"). To date, sixty-one nations have ratified the UNESCO Convention. In 1983, the United States ratified the UNESCO Convention with the passage of "The Convention on Cultural Property Implementation Act," 19 U.S.C. § 2601 *et seq. See also* Executive Order No. 12555 (1986). This act provides in part:

No article of cultural property documented as appertaining to the inventory of a museum or religious or secular public monument or similar institution in any State Party which is stolen from such institution after the effective date of this chapter [January 12, 1983], or after the date of entry into force of the Convention for the Party State, whichever date is later, may be imported into the United States.

19 U.S.C. § 2607.

The Hague Convention and the UNESCO Convention are not controlling in this case; however, they emphasize the importance that the United States and other countries have placed on restricting international trafficking in stolen art.

**3.** While this action was pending, the Turkish Republic of Northern Cyprus ("TRNC") sought permission to intervene as a plaintiff for the purpose of recovering possession of the mosaics. By order dated May 30, 1989, this Court denied the TRNC's motion to intervene because that government is not recognized by the United States. As previously stated, the Kanakaria Church is located in an area controlled by the TRNC. The TRNC's efforts to intervene as a plaintiff in this case strongly indicate that it, too, never authorized the removal or sale of the Kanakaria mosaics.

much cultural property in Cyprus. Many churches, museums, and private collections have been looted, and other property has suffered destruction or loss. In some instances visitors who were allowed access to the occupied area would note such losses and report them to the Republic of Cyprus. It was through one such visitor that the Department of Antiquities first learned in November 1979 that the mosaics of the Kanakaria Church were missing. The Department is charged with the responsibility, among other things, of protecting church property which is either an antiquity or a national monument. The mosaics fall under this responsibility. Therefore, the Republic of Cyprus decided to seek recovery of the mosaics.

Immediately upon learning that the mosaics were missing, the Republic of Cyprus contacted UNESCO, informing it of the significance of the lost art and seeking its assistance. Thereafter, the Republic of Cyprus notified several people and entities whom it believed could assist it in disseminating information about the missing mosaics and in recovering them. Cyprus continued to meet and discuss the situation with UNESCO officials in order to heighten awareness of Cyprus's loss of cultural property. Cyprus notified the International Council of Museums, an organization that coordinates and develops measures and security for museums throughout the world. It notified the International Council of Museums and Sites, an organization that works with restorers and specialists in the preservation of ancient monuments. The Republic of Cyprus introduced a resolution concerning the missing mosaics to Europa Nostra, a European organization interested in the conservation of the architectural heritage of Europe. The Republic of Cyprus sent the Europa Nostra resolution to the Council of Europe, which it believed would give wide publicity to the problem. Cyprus's ambassador and permanent delegate to the United Nations, Constantine Leventis, assisted in contacting these organizations. In addition, Ambassador Leventis spoke of the missing mosaics to individuals from museums, such as the British Museum and the Louvre, and to individuals from international auction houses, such as Christie's and Sotheby's.

The Republic of Cyprus also contacted both European and American museums about the missing mosaics. It contacted Harvard University's Dumbarton Oaks Institute for Byzantine Studies, considered to be the leading center in the United States for the study of Byzantine art. Dr. Vassos Karageorghis, Cyprus's Director of the Department of Antiquities from 1964 to 1989, and Anthanasios Papageorghiou, Curator of Ancient Monuments in Cyprus since 1962 and currently Acting Director of the Department of Antiquities, disseminated information about the missing mosaics to their colleagues and scholars throughout the world by sending letters and by addressing symposia, congresses, and other such meetings.

In addition, the Embassy of Cyprus in Washington, D.C. sent press releases and mailed information on a routine basis concerning the loss of Cyprus's cultural property in general and specifically the missing mosaics. Such information was disseminated to journalists, Members of Congress, legislative assistants working in foreign affairs, and individuals in academia, archaeology, and in organizations who have expressed an interest in Greek and Cypriot affairs. The Embassy's mailing list contains several hundred names. The information sent out from the Embassy often included the speeches given around the world by Greek Cypriot officials asking for assistance in recovering the mosaics.

Throughout all these efforts, the Republic of Cyprus intended to disseminate the information that the mosaics were missing, to seek assistance from those in positions who might be able to aid Cyprus in its efforts, and to eventually recover lost or stolen cultural properties such as the mosaics. As a result of these efforts, the Republic of Cyprus has recovered some antiquities, including frescoes originally from a church in occupied northern Cyprus and other parts of the original Kanakaria mosaic. Additionally, as a result of these efforts, the Republic of Cyprus located the mosaics in this case.

## E. The Mosaics Resurface

Goldberg is president and majority shareholder of Goldberg & Feldman Fine Arts, Inc. The co-owner of the company is George Feldman who serves as its vice president. Since becoming an art dealer in 1981, Goldberg has dealt almost exclusively in 19th and 20th century paintings, etchings, and sculptures. Goldberg is not, nor does she claim to be, an expert in Byzantine art.

On June 30, 1988, Goldberg flew to Amsterdam, The Netherlands, to inspect and possibly purchase for a client a painting by Amadeus Modigliani. The availability of a Modigliani painting for sale was brought to Goldberg's attention by Robert Fitzgerald, an art dealer from Indianapolis whom she "had known [ ] casually since 1980 or '81." Tr. 433. It was Fitzgerald who had located the purported Modigliani; he was to help facilitate the sale. In Amsterdam, Goldberg met Fitzgerald. Fitzgerald then took Goldberg to meet the owner of the painting. After inspecting the painting, Goldberg developed doubts "about being able to prove the authenticity of the painting." Tr. 438. At this point, the sale of the Modigliani painting fell through.

After the Modigliani sale fell through, Fitzgerald mentioned to Goldberg another deal. On July 1, 1988, Fitzgerald informed Goldberg that he was aware of four early Christian mosaics that were for sale. Later that day, Fitzgerald introduced Goldberg to Michel van Rijn, a Dutch art dealer, and Ronald Faulk, an attorney from California. Goldberg knew very little about van Rijn or Faulk. She was told, however, that van Rijn was once convicted in France for forging Marc Chagall's signature to prints of that artist's work and that he also had been sued by an art gallery "[f]or failure to pay money." Tr. 539.[4] She was also aware that Faulk was in Europe to act as attorney for Fitzgerald and van Rijn.

At this July 1st meeting, van Rijn showed Goldberg photographs of the four Byzantine mosaics, and she immediately "fell in love" with them. Tr. 447. van Rijn told her that the seller requested $3 million for the four mosaics. She was also told that the seller was interested in selling the mosaics quickly because he "had recently become quite ill and had [a] cash problem." Tr. 457.

All of the information that Goldberg received regarding the mosaics and the seller came from Fitzgerald, van Rijn, or Faulk.[5] van Rijn told Goldberg that the seller of the mosaics was a Turkish antiquities dealer. In addition, he told her that the seller had "found" the mosaics in the rubble of an "extinct" church in northern Cyprus while serving as "an archaeologist from Turkey assigned to northern Cyprus." Tr. 456. According to van Rijn, the seller had been granted permission by Turkish Cypriot authorities to retain the mosaics and, in the late 1970s, to export them to Germany. Goldberg was not told the identity of the seller at the initial meeting on July 1st; however, two days later she was told that the seller was a man named Aydin Dikman.[6]

Previously, on June 28, 1988, Faulk went to meet with Dikman in Munich, Germany. Faulk was sent to meet with Dikman at the direction of his clients, van Rijn and Fitzgerald. It is interesting to note that Fitzgerald sent Faulk to meet with Dikman even before Fitzgerald mentioned the mosaics deal to Goldberg. In Munich, Faulk discussed a possible sale with Dikman, and Dikman gave him photographs of the mosaics.

At the July 1st meeting in Amsterdam, Goldberg knew that Faulk and Dikman had met earlier to discuss the sale of the mosa-

---

**4.** Goldberg testified that van Rijn also told her that he was a descendant of Rembrandt on his father's side and of Rubins on his mother's side. Tr. 462. No other evidence supporting this claim was introduced, however.

**5.** Fitzgerald testified at trial; a deposition of Faulk was admitted into evidence and has been reviewed by the Court; van Rijn, however, did not testify, nor was he deposed.

**6.** In the record, the seller's surname is spelled as "Dikman," "Dikmen," and "Diekman." Throughout this memorandum entry, the Court will refer to the seller as "Dikman."

ics. Goldberg asked Faulk to travel to Munich to inform the seller of her interest in purchasing the mosaics. At Goldberg's direction, Faulk met with Dikman on July 1st and 2nd. Faulk was shown documents that Dikman claimed were proof that the mosaics had been exported properly from northern Cyprus. Faulk returned to Amsterdam on July 2nd and reported to Goldberg that, in his opinion, the export documents appeared to be in order. At trial, the defendants offered Exhibits 702, 3015, and 3016, as support for their contention that Goldberg reasonably believed the mosaics had been properly exported. None of these documents, however, even mentions Dikman or the four mosaics at issue in this case.

For example, exhibit 702 is a sales invoice from a "Goklaney's Cash & Co." to an individual named Helga Bechly. The invoice refers to five floor mosaics, not the four wall mosaics at issue in this case. The Court is at a loss to understand how this sales invoice substantiates the defendants' contentions that Dikman found the mosaics in the rubble of an extinct church, and that Turkish Cypriot officials authorized the export of the mosaics.

On July 3, 1988, while still in Amsterdam, Goldberg negotiated an agreement with van Rijn, Fitzgerald, and Faulk, whereby "the parties agree[d] to acquire the mosaics for their purchase price of $1,080,000 (U.S.)." Exhibit 700. The agreement also provided that the parties would split the profits made on any future resale of the mosaics as follows: Goldberg & Feldman 50 %; Fitzgerald 22.5 %; van Rijn 22.5 %; and Faulk 5 %. *Id.* This agreement was executed on July 4th in Amsterdam. *Id.*

Later, Goldberg and Fitzgerald traveled to Geneva, Switzerland, to investigate a lead on a second possible Modigliani and to examine the mosaics. On July 5th, Faulk and Dikman transported the mosaics by airplane from Munich to Geneva. The mosaics were stored in crates in the free port area of the Geneva airport. The mosaics never passed through Swiss Customs.

After arriving in Geneva, Faulk and Dikman met Goldberg in the free port area of the airport. This was the only time that Goldberg met Dikman. Dikman introduced himself to Goldberg and then left. In the presence of Faulk, Goldberg then inspected the four mosaics. Upon seeing the mosaics, she "was in awe" and wanted to buy them "more than ever." Tr. 486. She was concerned, however, about their deteriorating condition.

Goldberg testified that while she was in Geneva she inquired as to whether the mosaics had been reported as stolen or missing and whether any applicable treaties might prevent the mosaics from being imported into the United States. She testified that she contacted, by telephone, the International Foundation for Art Research ("IFAR") in New York and UNESCO's office in Geneva. In addition, Goldberg claims she telephoned customs offices in the United States, Germany, Switzerland, and Turkey.

### F. Goldberg Secures Financing

Goldberg has done business with Merchants National Bank of Indianapolis ("Merchants") for about five years. Her principal contact at the bank is Otto N. Frenzel III, Vice Chairman of Merchants National Bank & Trust Company of Indianapolis and Chairman of the Board of Merchants National Corporation. Goldberg and Frenzel have known each other for several years and have developed a good friendship. In addition, Frenzel and his wife have purchased art from Goldberg on several occasions, and Merchants has requested Goldberg's assistance in evaluating whether to loan money for art purchases.

In Amsterdam, while contemplating the purchase of the Kanakaria mosaics, Goldberg knew she would have to borrow a substantial amount of money if she were to purchase the mosaics. She called Frenzel at his home to discuss possible financing from Merchants. Frenzel indicated that if Goldberg were certain about the propriety of purchasing the mosaics, he would attempt to arrange a loan for her. Frenzel

referred her loan request to Timothy Massey, Vice President of the Professional Banking Department. Frenzel testified that he can recommend individuals for loans by volunteering to a loan officer his impressions of an individual's background, what he might know about a person, and what a person's expertise might be. Frenzel told Massey that Frenzel thought that Goldberg was a very bright individual with regard to art, that she was credible, and that she had a great deal of expertise. Frenzel also indicated to Massey that he, Frenzel, was comfortable with Goldberg.

Goldberg testified that she told Frenzel and Massey that the bill of sale of the mosaics to her would reflect a purchase price of $1.2 million. She further testified that she told Frenzel that out of this amount, she would either keep or receive back from the seller ten percent of the amount, or $120,000, to pay for her expenses, such as insurance, shipping, restoration, and operation of the business. Massey testified in his deposition that he understood the purchase price to be $1.2 million, and that he did not know at the time of the loan that she intended to keep ten percent of the loan. Frenzel testified in his deposition that he understood the purchase price to be $1.2 million.

After Goldberg arrived in Switzerland, Merchants agreed to loan her $1,224,000 for the purchase of the mosaics. Goldberg signed a business promissory note binding Goldberg & Feldman Fine Arts, Inc. as a corporation and herself individually on the loan. She also signed a security agreement offering the mosaics as security for the loan. Upon returning home to Indiana, Goldberg signed an additional agreement with Merchants, granting the bank five percent of the profits of the resale of the mosaics, not to exceed $175,000.

## G. Goldberg Purchases the Mosaics

The sale and transfer of the mosaics was originally scheduled for July 5th; however, a delay in securing financing from Merchants prevented Goldberg from consummating the sale on that date. The $1.2 million from Merchants did not arrive at a bank in Geneva until July 7th. The $1.2 million was in $100 bills and was placed in two carrying bags. Of the $1.2 million, Goldberg kept $120,000 in cash, and gave the remaining $1,080,000 to Faulk and Fitzgerald for the purchase of the mosaics.

Goldberg testified that she did not know how the $1,080,000 was to be divided among the seller and the middlemen. She testified that she thought the middlemen would receive a small amount as commission, such as $80,000. However, the remaining $1,080,000 was actually divided as follows:

—$350,00 to Dikman as payment for the mosaics;
—$282,500 to van Rijn as a commission;
—$297,500 to Fitzgerald as a commission;
—$70,000 to an attorney in London;
—$80,000 to Faulk for legal fees and/or assistance in facilitating the sale.

Tr. 318–20. Upon completion of the sale on July 7th, Dikman issued a "General bill of sale" to Goldberg & Feldman Fine Arts, Inc. Exhibit 9. The bill of sale lists $1.2 million as the price Goldberg paid for the mosaics. *Id.*

On July 8, 1988, Goldberg returned with the mosaics to the United States. Goldberg insured the mosaics for $1.2 million and declared their value at U.S. Customs to be $1.2 million. As previously noted, Goldberg paid $1.08 million for the mosaics.

## H. Significant Events in Indiana

Goldberg returned to Indiana with the four mosaics and with approximately $70,000 of the $120,000 she kept from the Merchants loan. In Europe she spent approximately $50,000 on conversion charges, shipping and insurance, and the purchase of four paintings and a small piece of art in The Netherlands. Goldberg testified that she deposited the remaining $70,000 in several of her bank accounts in Indiana. Exhibits 2201 through 2209 show a series of deposits, each under $10,000, in various business or personal accounts of Goldberg. At some point after Goldberg returned to Indiana with the mosaics, Frenzel and an-

other Indiana resident, Dr. Stewart Bick, acquired interests in the resale profits of the mosaics.

Frenzel personally loaned Goldberg $25,000 in an unrelated art transaction. Frenzel stated in his deposition that the terms of the loan were ten percent interest and a two percent interest in the resale profits of the mosaics.

Additionally, at some point after Goldberg's return to Indiana, Dr. Bick and Frenzel together acquired an interest in the resale profits of the mosaics. Fitzgerald testified that he and van Rijn each sold half of their interest in the resale profits to Dr. Bick. Dr. Bick gave them $780,000 for such interests. Fitzgerald received $375,000 for his half of his interest. As van Rijn and Fitzgerald each originally owned 22½ percent of the resale profits, this sale of interests to Dr. Bick gave him a 22½ percent interest in the resale profits, and left van Rijn and Fitzgerald with a 22½ percent interest. Of this percentage, Dr. Bick sold an eight percent interest to Frenzel for $390,000. Frenzel testified that he gave $390,000 of his own money to Dr. Bick and acquired the additional eight percent interest. This, when combined with Frenzel's two percent noted earlier, provides Frenzel with a total of ten percent interest in the resale profits. Massey testified in his deposition that Merchants loaned Dr. Bick $390,000. It was Massey's understanding that, with Dr. Bick's borrowed $390,000 and with Frenzel's personal $390,000, Dr. Bick and Frenzel purchased and owned an interest in the resale profits of the mosaics.

Goldberg intended to sell the mosaics. Beginning in the fall of 1988, she contacted at least two people in an attempt to market and sell the mosaics. By October 1988 Goldberg had discussed the sale of the mosaics with Dr. Geza von Habsburg, an art dealer operating out of Geneva and New York. In October of 1988 von Habsburg contacted Dr. Marion True of the Getty Museum in California and discussed whether the Getty would be interested in purchasing the mosaics. Dr. True explained that the Getty does not collect Byzantine art and told von Habsburg that, because of her close working relationship with Cyprus, it would be necessary for her to contact her friend Dr. Vassos Karageorghis about the mosaics. Dr. True had developed a working relationship with Dr. Karageorghis, and he had often spoken to her of Cyprus's attempts to recover the mosaics. Dr. True then called Dr. Karageorghis, who told her that export of the mosaics was not authorized by Cyprus and that the mosaics she described were the mosaics which Cyprus had been so interested in recovering. Dr. True gave Dr. Karageorghis the name of Geza von Habsburg and how to contact him.

In November 1988, Dr. Karageorghis and Papageorghiou, in conjunction with Cyprus's Director General of the Ministry of Foreign Affairs, contacted the Ambassador of Cyprus in Washington, D.C. They informed the Ambassador of the mosaics' existence in the United States and suggested that immediate and discreet action be taken to recover the mosaics. The embassy then began working with its attorneys, the plaintiffs' Washington law firm in this case, to determine the location and possessor of the mosaics. Embassy officials worked discreetly so as not to put the mosaics in any danger or cause them to disappear underground again.

By January 1989, Goldberg had also contacted her friend and art mentor Barbara Divver, who is an art dealer in New York. Divver contacted her friend John Walsh, Director of the Getty Museum, about the Getty's possible acquisition of the mosaics. Goldberg and Divver had agreed that if the Getty Museum eventually purchased the mosaics, Goldberg would give Divver a ten percent commission. Walsh directed that Dr. True, because she was more familiar with Cyprus's situation regarding the mosaics, respond to Divver's inquiry. Dr. True spoke with Divver and explained to her substantially the same things she had discussed with von Habsburg. Dr. True told Divver that Dr. True would report this contact to the plaintiffs' Washington law firm and to U.S. Customs, which she did.

The plaintiffs and their attorneys eventually learned that the mosaics were in Goldberg's possession in Indianapolis. The plaintiffs wrote to Goldberg requesting the return of the mosaics. Upon the defendants' refusal, the plaintiffs instructed their attorneys to file suit to recover the mosaics.

Throughout this opinion, the Court will discuss such additional facts as may be necessary to support the determinations reached herein.

## IV. *Statute of Limitations*

A federal district court sitting in diversity must follow state statutes of limitations. *Guaranty Trust Co. of New York v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). Moreover, a federal district court sitting in diversity must follow the choice-of-law rules of the state in which it sits. *Klaxon v. Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Because in Indiana statutes of limitations are procedural in nature, Indiana choice-of-law rules state that the statute of limitations of the forum state, Indiana, will apply. *Albrecht v. Indiana Harbor Belt Railroad Co.*, 178 F.2d 577 (7th Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 804, 94 L.Ed. 1363 (1950); *Dart Industries, Inc. v. Adell Plastics, Inc.*, 517 F.Supp. 9 (S.D.Ind.1980); *Horvath v. Davidson*, 148 Ind.App. 203, 264 N.E.2d 328 (1970).

The Indiana code provides in relevant part:

> The following actions shall be commenced within six [6] years after the cause of action has accrued and not afterwards.

> . . . .

> Third. For injuries to property other than personal property, damages for any detention thereof, and for recovering possession of personal property.

I.C. § 34-1-2-1 (Burns 1986). Particularly in light of the plaintiffs' claim that the mosaics should be returned to the Church of Cyprus, the Court concludes that the Indiana statute of limitations providing specifically "for recovering possession of personal property" governs the issue of possession of the mosaics. Therefore, the plaintiffs' action is governed by a six-year statute of limitations.

Sometime between August 1976, when military force and threat of harm had forced church officials to leave the church involuntarily, and November 1979, the mosaics were removed from the Kanakaria Church. In November 1979 church and government officials first learned that the mosaics were missing from the Kanakaria Church. Goldberg acquired the mosaics in July 1988. The plaintiffs first learned that the mosaics were in Goldberg's possession in late 1988. The plaintiffs filed this action against Goldberg in March 1989. The defendants argue that the plaintiffs' cause of action first accrued in 1979 and that, because the complaint was not filed within six years thereof, plaintiffs' cause of action is barred. The plaintiffs, however, argue that under the circumstances of this case, they are not barred from recovering the mosaics. Thus the issue is whether the plaintiffs have filed their complaint in a timely fashion.

### A. Policy

The courts reflect a strong policy in favor of statutes of limitations. The Indiana supreme court has stated:

> Formerly, statutes of limitations were looked upon with disfavor in that they are invariably in derogation of the common law. "Now, however, the judicial attitude is in favor of statutes of limitations, rather than otherwise, since they are considered as statutes of repose and as affording security against stale claims." ... Such statutes rest upon sound public policy and tend to the peace and welfare of society and are deemed wholesome.... They are enacted upon the presumption that one having a well-founded claim will not delay in enforcing it.

*Shideler v. Dwyer*, 275 Ind. 270, 417 N.E.2d 281, 283 (1981). Further, the

Indiana court of appeals has ruled that "statutes of limitations are favored by the courts.... [t]hey are statutes of repose, founded upon a rule of necessity and convenience and the well-being of society." *Spoljanic v. Pangan,* 466 N.E.2d 37, 43 (Ind.App.1984) (citations omitted). These cases indicate that Indiana follows the policies reflected in statutes of limitation. *Accord, O'Keeffe v. Snyder,* 83 N.J. 478, 416 A.2d 862, 868 (1980) ("The purpose of a statute of limitations is to 'stimulate to activity and punish negligence' and 'promote repose by giving security and stability to human affairs,' ") (*quoting Wood v. Carpenter,* 101 U.S. 135, 139, 25 L.Ed. 807, 808 (1879)).

**B. Determination of the Timeliness and Accrual of a Cause of Action**

The fact that statutes of limitations exist, however, does not mean that the timeliness of a claim is determined solely by the mechanical application of a period of months to a file-stamp date. Rather, under certain circumstances a court is required to evaluate the timeliness of a claim under rules and doctrines of law designed to ensure fairness and equity in the adjudication of claims. The facts of this case warrant that the Court evaluate the timeliness of the plaintiffs' claims under the following rules and doctrines.

First, the Indiana supreme court has held that the determination of when a cause accrues is the court's responsibility. *Burks v. Rushmore,* 534 N.E.2d 1101 (Ind. 1989). The applicable Indiana statute of limitations states that actions for the recovery of personal property "shall be commenced within six [6] years after the cause of action has accrued and not afterwards." I.C. § 34–1–2–1. Regarding the language "after the cause of action has accrued," the court has stated that "the legislature designated the reasonable time for bringing an action and left to the courts the responsibility of determining when the cause accrues." *Burks,* 534 N.E.2d at 1103 (citation omitted). *See also Barnes v. A.H. Robins Co., Inc.,* 476 N.E.2d 84, 85 (Ind. 1985) ("[i]t is clear this Court has the authority and responsibility to interpret the intentions of the legislature by deciding when a cause of action accrues."). In *Burks, supra,* the Indiana supreme court reviewed the rules for determining when a cause of action accrues in Indiana. The *Burks* court noted that the general rule is that the statute of limitations begins to run when damage was ascertained or ascertainable by due diligence. 534 N.E.2d at 1104 (*citing Barnes,* 475 N.E.2d at 86). Thus, this Court notes that in Indiana the statute generally begins to run when damage was ascertained or by the use of due diligence could have been ascertained.

Second, Indiana recognizes a discovery rule as it may affect the running of a statute of limitations. In the *Barnes* case, *supra,* the Indiana supreme court, on a certified question from the Seventh Circuit, considered when a cause of action accrues when the injury to the plaintiff is caused by a disease which may have been contracted as a result of protracted exposure to a foreign substance. The court held that "in those circumstances, a discovery type rule should be applied, and the statute of limitations in such causes commences to run from the date the plaintiff knew or should have discovered that [the plaintiff] suffered an injury or impingement, and that it was caused by the product or act of another." 476 N.E.2d at 87–88. *See also Burks,* 534 N.E.2d at 1103; *Walters v. Owens–Corning Fiberglass Corp.,* 781 F.2d 570, 572 (7th Cir.1986). The court was careful to note that its adoption of the discovery rule in *Barnes* was limited to the specific circumstances before it, *i.e.,* injury as a result of protracted exposure to a foreign substance. The Court declined to adopt a discovery rule for all tort claims, stating "that would be going beyond the scope of the inquiry and put us in the position of issuing an advisory opinion." 476 N.E.2d at 87.

However, it is important for this Court to note the *Barnes* court's discussion of the discovery rule in general. In adopting a discovery rule in the case before it, the Indiana supreme court discussed the important policies supporting the discovery rule. The court stated:

Many jurisdictions have responded to the problems presented by this type of case by adopting a "discovery rule." The discovery rule provides that the statute of limitations in this type of cause runs from the date the negligence was or should have been discovered. The rule is based on the reasoning that it is inconsistent with our system of jurisprudence to require a claimant to bring his cause of action in a limited period in which, even with due diligence, he could not be aware a cause of action exists.

476 N.E.2d at 86. Further, in support of its decision to adopt a discovery rule, the court observed that "[i]ncreasing numbers of jurisdictions are adopting some form of discovery rule," citing recent cases from 14 states. Finally, the court stated that it had discussed a discovery rule previously, in *Shideler, supra.* In that case the court noted "that in many cases where the discovery rule has been applied or alluded to, the misconduct was of a continuing nature or *concealed* ..." 417 N.E.2d at 291 (emphasis added). The Indiana supreme court's adoption of the discovery rule in *Barnes* and its discussion of the policies and other jurisdictions supporting it indicate Indiana's willingness to extend the rule to other circumstances, if appropriate.

Third, Indiana recognizes the doctrine of fraudulent concealment as it may affect the running of a statute of limitations. Indiana has adopted the doctrine by case law and has reflected the doctrine in a statute.[7] The Indiana supreme court has stated:

> The harshness which may result from the application of a statute of limitations has been avoided by judicial recognition of certain exceptions. One of these exceptions is the doctrine of fraudulent concealment which operates as an equitable doctrine to estop a defendant from asserting a statute of limitations when he has, either by deception or by a violation of duty, concealed from the

plaintiff material facts thereby preventing the plaintiff from discovering a potential cause of action.

*Burks,* 534 N.E.2d at 1104 (citations omitted). The Indiana supreme court has also held that the doctrine of fraudulent concealment has its roots in equity, and that in general the doctrine operates to disallow a defendant, who by deceit or fraud prevents a plaintiff from learning of a cause of action, from taking advantage of his own wrong by asserting the statute of limitations as a bar to the plaintiff's action. *Guy v. Schuldt,* 236 Ind. 10, 138 N.E.2d 891, 894 (1956) ("While a wrongdoer is concealing from an injured person his wrongful act, the law will not, through a statute of limitations, strip the injured party of his remedy against the wrongdoer"). *See also Snyder v. Tell City Clinic,* 181 Ind.App. 188, 391 N.E.2d 623, 628 (1979) (concealment of fraud tolls the statute of limitations) (*citing Guy v. Schuldt, supra*); *Brown v. Gardner,* 159 Ind.App. 586, 308 N.E.2d 424, 428 (1974); *Ferrell v. Geisler,* 505 N.E.2d 137 (Ind.App.1987) (doctrine of fraudulent concealment as applied in context of medical malpractice). To invoke the doctrine of fraudulent concealment, Indiana requires that the concealment be active and intentional, and that such concealment misleads or hinders the plaintiff's inquiry or ability to investigate. *Morgan v. Koch,* 419 F.2d 993, 998 (7th Cir.1969); *Forth v. Forth,* 409 N.E.2d 641, 644–45 (Ind.App.1980). *See also Lambert v. Stark,* 484 N.E.2d 630, 632 (Ind.App.1985). For a plaintiff to invoke the doctrine of fraudulent concealment, Indiana requires that the plaintiff exercise due diligence to investigate the claim and attempt to discover the fraud. As the supreme court noted in *Guy v. Schuldt, supra,*

> If the fraud, although not discovered, ought to have been discovered, and could have been if reasonable diligence had been exercised by the plaintiff, the statute will run from the time discovery

---

**7.** I.C. § 34–1–2–9 provides:

> If any person liable to an action shall conceal the fact from the knowledge of the person entitled thereto, the action may be commenced at any time within the period of limi-

tation after the discovery of the cause of action.

*See also Walker v. Memering,* 471 N.E.2d 1202, 1204 (Ind.App.1984) (by statute, concealment may extend a statute of limitations).

ought to have been made. To prevent the the barring of an action, it must appear that the fraud not only was not discovered, but could not have been discovered with reasonable diligence, until within the statutory period before the action was begun.

138 N.E.2d at 896 (citations omitted). *See also Morgan v. Koch, supra,* 419 F.2d at 999; *Tolen v. A.H. Robins Co.,* 570 F.Supp. 1146, 1151–52 (S.D.Ind.1983); *Lambert,* 484 N.E.2d at 632; *Estate of Ballard v. Ballard,* 434 N.E.2d 136, 142 (Ind.App. 1982).

In addition to common law and statutory fraudulent concealment, Indiana courts have held that equitable estoppel will serve the same purpose and foreclose the use of a statute of limitations to a defendant who through fraud or misrepresentation prevents a plaintiff from commencing an action within the statute's original time frame. *See Donella v. Crady,* 135 Ind. App. 60, 185 N.E.2d 623, 625 (1962); *Landers v. Evers,* 107 Ind.App. 347, 24 N.E.2d 796, 797 (1940). The requirement that the plaintiff exercise due diligence applies to fraudulent concealment grounded in equitable estoppel as well. *Spoljanic, supra,* 466 N.E.2d at 44–45. Further, one Indiana court has held that under equitable estoppel, "[a] defendant may be prevented from relying upon a statute of limitations by his own misrepresentations or fraud, even though he has not concealed the cause of action." *Marcum v. Richmond Auto Parts Co.,* 149 Ind.App. 120, 270 N.E.2d 884, 886 (1971).

C. Application of Law to Case at Bar

■ The Court now applies the rules and principles developed above to the facts of this case. The Court notes that there is no Indiana case which controls the issues of when the statute of limitations begins to run and whether it has been tolled in an action for the replevin of stolen property such as valuable artwork. Therefore, it is this Court's responsibility to determine these issues as an Indiana court would. "The duty of a district court sitting in diversity faced with a novel [issue] ... is to predict, as best as possible, how an

[Indiana] court would decide the issue." *Walters, supra,* 781 F.2d at 572 (citation omitted). Although many of the Indiana cases discussing the timeliness of claims have been malpractice or products liability actions, the Court believes that Indiana has developed rules sufficient to allow this Court to apply them in the context of a replevin action for the recovery of stolen artwork. Under the facts of this case, the Court concludes that under Indiana law the plaintiffs' action is timely filed.

The Court holds that the plaintiffs' cause of action did not accrue in this case until the plaintiffs, using due diligence, knew or were on reasonable notice of the identity of the possessor of the mosaics. In this context a discovery rule should apply and prevent the statute from running until the plaintiffs knew or reasonably should have known who possessed the mosaics.

The court in *O'Keeffe v. Snyder, supra,* was faced with a similar issue. In that case the plaintiff Georgia O'Keeffe filed suit to replevy from the defendant three small pictures she had painted. She contended that the paintings were stolen. The defendant contended, *inter alia,* that the plaintiff's action was barred by a six-year statute of limitations. Plaintiff O'Keeffe claimed that the paintings were stolen in 1946. In 1976, O'Keeffe learned that her paintings were in the possession of the defendant. She filed suit for their return in 1976. In determining whether O'Keeffe's action was filed in a timely manner, the New Jersey supreme court reviewed its applications of the discovery rule. It noted that it had adopted the rule in the area of medical malpractice, and then extended it to other contexts. The court concluded that

the discovery rule applies to an action for replevin of a painting ... [the plaintiff's] cause of action accrued when she first knew, or reasonably should have known through the exercise of due diligence, of the cause of action, including the identity of the possessor of the paintings.

416 A.2d at 870.

Similarly, this Court is persuaded that the discovery rule should apply to this case.

The discovery rule prevents the statute from beginning to run in situations where a plaintiff, using due diligence, cannot bring suit because he is unable to determine a cause of action. In a replevin action, a plaintiff sues a defendant for the recovery of specific property. An element of the cause of action is the defendant's wrongful detaining or wrongful possession of the property sought to be recovered. In order to maintain a replevin action, the plaintiff must know who is in possession of the property at issue. If a plaintiff is unable to determine the possessor of stolen items, the plaintiff cannot maintain a cause of action in replevin.

The Court concludes that a plaintiff who seeks protection under the discovery rule has a duty to use reasonable diligence to locate the stolen items. *See DeWeerth v. Baldinger*, 836 F.2d 103 (2d Cir.1987), *cert. denied*, ── U.S. ──, 108 S.Ct. 2823, 100 L.Ed.2d 924 (1988). Determination of due diligence is fact-sensitive and must be made on a case-by-case basis. *O'Keeffe*, 416 A.2d at 873. Having reviewed the facts of this case, the Court is persuaded that the plaintiffs exercised due diligence in their search to locate and to recover the mosaics.

From the time they first learned of the mosaics' disappearance, the Republic of Cyprus engaged in an organized and systematic effort to notify those who might assist them and to seek the return of the mosaics. As previously set out by the Court, Cyprus has contacted and worked with the United Nations, UNESCO, museums, museum organizations, leading Byzantine scholars and curators, and the press. Officials of the Republic of Cyprus have sent press releases and other information, delivered speeches, and made numerous personal contacts with individuals reasonably calculated to assist in recovery of the mosaics. Tr. 80–81, 90–101, 190–206, Leventis Deposition 21–45, True Deposition 25.

Dr. Marion True, Curator of Antiquities at the J. Paul Getty Museum in Los Angeles, testified that the Cypriots "had brought the loss of these mosaics to the attention of people who would have been more directly involved with Byzantine art." True Deposition 127. Cyprus's actions were designed to recover the mosaics at opportunities where the mosaics might be offered for sale. According to Dr. Gary Vikan, the plaintiffs' art expert and Assistant Director for Curatorial Affairs/Medieval Curator of the Walters Art Gallery in Baltimore, this strategy was "consistent with what is happening in the art world today, the goal is to stifle the trade at the point of destination." Tr. 388. Dr. Vikan further testified that, in his opinion, the Republic of Cyprus has been duly diligent in its attempts to recover lost cultural property, including the mosaics. Tr. 342, 382. In fact Dr. Vikan stated that in the Mediterranean, Cyprus "stands apart" in its attempts to recover such property. Tr. 342. Dr. Vikan's testimony on this issue, as well as the testimony of the Greek Cypriot officials who were directly involved in these efforts, is credible and persuasive on this issue. The Court concludes that the plaintiffs have exercised due diligence in their search for the mosaics.

Further, the Court concludes that the plaintiffs did not know and were not reasonably on notice of the identity of the possessor of the mosaics until late 1988. The defendants argue that two incidents, an article in a Turkish publication and the recovery (assisted by the Menil Foundation) of frescoes and portions of the Kanakaria mosaic, should have put Cyprus on notice as to who was in possession of the mosaics at issue in this case. The Court disagrees.

A June 10, 1982 article in the Turkish publication *Ortam* contained the headline "Antique Smuggler, Aydin Dikmen, [sic] Allegedly to Deposit Money in the Bank Account of a Judge." Exhibit 2174. The article reported that Dikman was wanted for smuggling antique artifacts, that he was arrested and released shortly thereafter, and that Dikman's wife had allegedly deposited a large sum of money in the bank account of a judge. *Id.* The single paragraph of the article discussing Dikman linked him by implication to the theft of church icons from the Girne Castle museum. The majority of the article discussed the loss of cultural property from churches

and museums in general on the island of Cyprus. The last section of the article discussed the mosaics missing from the Kanakaria Church. The article contained two pictures, each of portions of the Kanakaria mosaic. *Id.* Papageorghiou testified that the article did not make any connection between the mosaics and Aydin Dikman. Tr. 173. When Cyprus was made aware of Turkish press reports of missing Cypriot antiquities, it repeated its systematic steps of notification such as contacting UNESCO and sending out press releases. Tr. 193–94; Leventis Deposition 82. The Court concludes that Cyprus took reasonable steps upon learning of such information. The Court further concludes that nothing in the Turkish press did or reasonably should have put the Republic of Cyprus on notice that the mosaics were or could have been in Dikman's possession.

Similarly, Cyprus's recovery of frescoes and portions of the original Kanakaria mosaic in 1983 and 1984 with the assistance of the Menil Foundation in Texas did not and reasonably should not have put Cyprus on notice of who may have possessed additional portions of the mosaic. A series of events beginning in 1983 led to the recovery of the frescoes and portions of the mosaic. In 1983, London-based art dealer Yanni Petsopoulos contacted the Menil Foundation. de Menil Deposition 18. The Foundation has done business with Petsopoulos and employed him as a special agent for several years. Hopps Deposition 65. Petsopoulos had been approached by a man of Turkish nationality based in Germany (who, unbeknownst to any officials of the Republic of Cyprus turned out to be Aydin Dikman). Dikman asked Petsopoulos to help sell some frescoes in Dikman's possession. Leventis Deposition 47–48. Dikman represented that the frescoes were from Turkey. Hopps Deposition 73. Petsopoulos contacted the Menil Foundation about the possible purchase of the frescoes. Representatives of the Menil Foundation, including Walter Hopps, senior consultant, and Mrs. Dominique de Menil, president of the Foundation and widow of its founder, traveled with Petsopoulos to Germany to view the frescoes.

In Munich, they met Aydin Dikman, viewed the frescoes, and discussed their acquisition. *Id.* at 89. In Dikman's apartment they observed a mosaic. Hopps Deposition 68, 91; de Menil deposition 18. Later, Petsopoulos discussed with Hopps his suspicion that the mosaic was a part of the Kanakaria mosaic. Petsopoulos decided to research the matter. Petsopoulos's suspicion raised a question in Hopps's mind as to whether the frescoes were actually from Turkey, or whether they too could be from Cyprus. Hopps Deposition 114–15.

The Menil Foundation decided to purchase the frescoes. Hopps Deposition 98. It was determined that the frescoes were from Cyprus and that the mosaic seen in Dikman's apartment was part of the Kanakaria mosaic. Hopps Deposition 118, 125, 128–29. The Menil Foundation acquired the frescoes for the Church of Cyprus and reached an agreement which allowed the Menil to exhibit the frescoes for a period of time before returning them to Cyprus. de Menil Deposition 13, 32. Petsopoulos devised a plan to recover the Kanakaria mosaic in Dikman's possession for the Republic of Cyprus.

Petsopoulos went to Dikman's villa in Turkey. Petsopoulos accused Dikman of lying to him and to the Menil Foundation about the origin of the frescoes. The meeting became "stormy" and there ensued an "enormous emotional explosion." Hopps Deposition 154–55. Petsopoulos proposed that to make up for having lied about the frescoes, Dikman should turn over what portions he possessed of the mosaic. Hopps Deposition 146–47. After an "emotional fracas," Dikman agreed and felt that the "honorable thing to do was to turn over what he had of the mosaics." Hopps Deposition 156. Petsopoulos arranged to effect transfer of the mosaics. Ambassador Leventis secured the recovery of four pieces of mosaic, two of which Cyprus determined were not genuine. Leventis Deposition 52–53. Dikman represented to Petsopoulos that he was returning all portions of the mosaic in his possession.

Throughout this series of events, officials of the Republic of Cyprus questioned

Petsopoulos and Menil Foundation officials about who was in possession of the frescoes and mosaics, but no one would reveal such information. Leventis Deposition 48–49, 53; Tr. 207; Hopps Deposition 141–42, 163. Ambassador Leventis questioned on several occasions whether the individual from whom the mosaics were recovered possessed any additional pieces of the mosaic, and he was always told no. Leventis Deposition 51, 52, 54. Hopps himself did not believe that Dikman possessed any additional parts of the mosaic. Hopps Deposition 149.

Hopps and Petsopoulos did not tell Cypriot officials who had possessed the frescoes and mosaics because they feared reprisals against any remaining artwork or against the individuals or families of individuals who were involved in recovery. Hopps Deposition 150–53. Dr. Karageorghis stated that he understood this danger, having relayed at least one story of a violent reprisal in which the quarters of some individuals assisting Cyprus in recovering some antiquities were bombed. Hopps Deposition 152–53, 165, 187–89.

The Court concludes that throughout this series of events, the plaintiffs were not nor should they reasonably have been on notice of the possessor of the mosaics at issue in this case. The plaintiffs made diligent inquiries of those involved. However, the plaintiffs never learned of any identity or information sufficient to put them on notice of whom to investigate or of who possessed the mosaics. It was reasonable for both those involved in recovering antiquities for Cyprus and Greek Cypriot officials to fear reprisals against individuals or the art itself. It would be pointless and destructive to require the plaintiffs to have taken additional steps to investigate the recovery of its property if it was reasonable that such steps might result in physical harm or destruction to human life or the art itself. Cyprus concluded that no publicity should be given to the recovery of the mosaics at that time, believing publicity might affect United Nations' negotiations involving the sensitive, political division of Cyprus. Tr. 164.

The plaintiffs knew that the defendants were in possession of the mosaics in late 1988. The plaintiffs exercised due diligence but were unable to determine who possessed the mosaics until that time. Therefore, the plaintiffs' cause of action did not accrue until late 1988. The discovery rule prevents the statute from running until that time because the plaintiffs' cause of action did not accrue until they knew or were reasonably on notice of the identity of the possessor of the mosaics. *See O'Keeffe, supra.*[8] Accordingly, as the plaintiffs' complaint was filed in March of 1989, it is within the six-year statute of limitations and is timely filed.

Assuming, *arguendo*, that the discovery rule does not apply under the facts of this case, the Court concludes that the plaintiffs' action is timely filed under the doctrine of fraudulent concealment. There is support for the proposition that a cause of action for the replevin of property accrues at the time of the theft. The *O'Keeffe* court held that apart from the discovery rule, the statute of limitations in replevin actions "ordinarily will run against the owner of lost or stolen property from the time of the wrongful taking . . . ." 416 A.2d at 872.[9] However the *O'Keeffe* court further stated that this was ordinarily true "absent fraud or concealment. Where the chattel is fraudulently concealed, the general rule is that the statute is tolled." *Id.* at 872–73 (citations omitted).[10] Assuming for purposes of discussion that the cause of action accrued in this case when the mosa-

---

8. *See also* 54 C.J.S. Limitations of Actions § 87 (discovery rule extended to situations in which equity and justice call for its application).

9. *See also* 51 Am.Jur.2d Limitation of Actions § 124 (general rule is that statute of limitations begins to run against owner of lost or stolen property at the time of wrongful possession); 79 A.L.R.3d 847, 851.

10. *See also* 51 Am.Jur.2d Limitation of Actions § 124, *supra* (in presence of fraud or concealment, statute of limitations does not run); 54 C.J.S. Limitations of Actions § 88 (general rule is that statute of limitations is tolled by fraud or concealment); 79 A.L.R.3d 847, 851, 856.

ics were stolen sometime between 1976 and 1979, the Court concludes that the doctrine of fraudulent concealment operates under the facts of this case to toll the six-year statute of limitations.[11]

The doctrine operates because the possessor and location of the mosaics were actively and fraudulently concealed from the plaintiffs. The fact that the mosaics were stolen and resurfaced in the art world after a period of approximately nine years indicates by its very nature that the mosaics were fraudulently concealed from the true owner, the Church of Cyprus. There is no evidence that the plaintiffs knew or reasonably should have known where the mosaics were from the time of the theft until 1988. As the court concluded above, nothing in a Turkish publication in 1982 did or reasonably should have put the plaintiffs on notice as to the possessor or location of the mosaics. Therefore, the doctrine of fraudulent concealment continued to run, uninterrupted. For purposes of this analysis it is sufficient to conclude that the doctrine tolled the running of the statute throughout 1983. As the plaintiffs' complaint was filed in March 1989 and the statute was tolled throughout 1983, the complaint was filed within the six-year limitation and is timely. For this reason it is unnecessary for the Court to consider whether the doctrine tolled the statute beyond 1983.

To invoke the doctrine of fraudulent concealment, Indiana requires that the plaintiff exercise due diligence to investigate the claim and discover the fraud. *Guy v. Schuldt,* and cases cited, *supra.* Church officials and worshipers were forced to leave the Kanakaria Church and the village of Lythrankomi in 1976. Thereafter they have been prevented from exercising dominion over the Kanakaria Church. They experienced the threatened and actual destruction of their civilized existence and their physical safety. Because of these dangers, the plaintiffs' belief that they could not visit and worship in the church was reasonable. Thus, from the time the mosaics were stolen until the plaintiffs first learned of the theft in 1979, the Court concludes that the plaintiffs were reasonably unable to exercise due diligence because they were prevented from maintaining the Kanakaria Church and its property, including the mosaics. Once the plaintiffs learned of the theft of the mosaics, they exercised due diligence in searching for them. *See* discussion *supra* at p. 1389.

The plaintiffs have demonstrated that the doctrine of fraudulent concealment should operate in this case.[12] Because the

---

**11.** The Indiana supreme court has previously noted that the doctrine of fraudulent concealment is applicable to many types of cases, including *inter alia* for the conversion of personal property and by an owner for the recovery of lost or stolen property. *Guy v. Schuldt,* 236 Ind. 101, 138 N.E.2d 891, 894–95 (1956) (citations omitted).

**12.** One Indiana appellate case has held that concealment of the identity of a party, as opposed to the concealment of a cause of action, does not support tolling of the statute under the doctrine of fraudulent concealment. *Landers v. Evers,* 107 Ind.App. 347, 24 N.E.2d 796 (1940). However, the Court concludes that this case is distinguishable from the case at bar.

In *Landers* the plaintiff was in an automobile accident. The defendant gave his name as "Harold" Evers instead of "Howard" Evers. The plaintiff sued the wrong person but did not learn this until the statute of limitations had run. In a suit against the correct defendant, plaintiff contended that the defendant fraudulently concealed his true identity from her and should be estopped from relying on the statute of limitations. The trial court disagreed and entered judgment for the defendant. The Indiana appellate court affirmed, holding that in Indiana statutory fraudulent concealment relates to the cause of action and not to the identity of the person against whom suit may be brought. 24 N.E.2d at 797.

However, the court went on to note that the plaintiff in *Landers* did not exercise due diligence. The court noted that the plaintiff "was in possession of the means to ascertain the proper person against whom to bring the action, if ordinary diligence had been exercised." *Id.* (citations omitted). Thus the court in that case did not decide that fraudulent concealment was inapplicable as much as it decided that the plaintiff had not exercised due diligence. The court refused to apply fraudulent concealment or equitable estoppel because the plaintiff in that case was not duly diligent.

In the case at bar this Court does not believe *Landers* forecloses this Court's determinations herein. As discussed above, the Court concludes that as long as the plaintiff is duly dili-

limitations period in this case is triggered by a specified event, *i.e.*, the theft of the mosaics, *see Burks, supra,* 534 N.E.2d at 1105, the Court concludes that the statute of limitations was tolled by fraudulent concealment and equitable estoppel such that the plaintiffs filed their complaint in a timely manner. Because the Court has concluded that the plaintiffs were duly diligent and that their action is timely filed, it is unnecessary to address any of the defendants' other arguments, such as laches.

### V. *Choice–of–Law*

A federal district court exercising diversity jurisdiction under 28 U.S.C. § 1332 must apply state substantive law. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987). Moreover, a federal district court sitting in diversity must follow the choice-of-law rules of the state in which it sits to determine which state's substantive law to apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *DeValk,* 811 F.2d at 329. Therefore, this Court, exercising diversity jurisdiction over this suit, must apply the choice-of-law rules of the state in which it sits, namely, Indiana.

### A. Indiana Law Analysis

■ Indiana's traditional choice-of-law doctrine was *lex loci delicti commissi,* which dictated that the place where the wrong was committed governed which state's substantive law to apply. *Hubbard Mfg. Co., Inc. v. Greeson,* 515 N.E.2d 1071, 1073 (Ind.1987). This traditional rule has

been modified, however. In *W.H. Barber Co. v. Hughes,* 223 Ind. 570, 63 N.E.2d 417 (1945), the traditional *lex loci* rule was modified in the area of contract law. "The modified rule allowed the state with the most significant contacts to apply its substantive law even if the breach occurred in another state." *Hubbard,* 515 N.E.2d at 1073. Similarly, in *Hubbard, supra,* the Indiana supreme court modified the traditional rule in the area of tort law, and adopted the "most significant contacts" analysis in torts as well as in contracts. *Id.; see Consolidated Rail Corp. v. Allied Corp.,* 692 F.Supp. 924, 927 (N.D.Ind.1988). Today, *Hubbard* is the leading case to discuss Indiana's choice-of-law rules.[13]

In *Hubbard,* the Indiana supreme court adopted a two-step analysis to be used in determining choice of substantive law. The first step is to consider whether the place of the wrong "bears little connection" to the legal action. 515 N.E.2d at 1073–74. If the contact is significant, then the Court must apply the substantive law of the state (or jurisdiction) where the wrong was committed. *Id.* The place where the wrong was committed in the present case is Switzerland; it was there that Goldberg took possession of and control over the mosaics. Switzerland "bears little connection" to the plaintiffs' cause of action. Neither the plaintiffs nor the defendants are citizens of Switzerland. None of the other individuals involved in the sale of the mosaics, namely, Dikman, Fitzgerald, van Rijn, or Faulk is a citizen of Switzerland. No Swiss citizen earned a profit on the sale of the mosaics, nor does any Swiss citizen own any interest in the mosaics.

---

gent, the inability to discover the possessor of the stolen mosaics invokes the doctrine of fraudulent concealment and tolls the running of the statute of limitations for replevin purposes.

**13.** No Indiana case discusses choice-of-law rules in the context of a replevin action. However, *Hubbard* and *Barber* are significant in that they demonstrate the Indiana supreme court's modifications to Indiana's traditional *lex loci* rule. These modifications clearly indicate Indiana's shift to the most significant contacts analysis in choice-of-law determinations. *See also Restatement (Second) of Conflict of Laws* § 145 (most significant relationship analysis in torts); § 188

(most significant relationship analysis in contracts) (1971). Therefore, this Court believes that the analysis set forth in *Hubbard* provides the proper analytical framework for the choice-of-law issue presented in a replevin case such as this.

Further, the Court notes that conversion, a cause of action very similar to replevin, is a tort and therefore would fall under *Hubbard's* most significant contacts analysis for choice-of-law purposes. The fact that conversion would be analyzed under the most significant contacts approach is further support for this Court's decision to analyze this action for replevin under the most significant contacts approach as well.

Switzerland's lack of significant contacts is also highlighted by the fact that the mosaics never entered the Swiss stream of commerce. The mosaics were on Swiss soil no more than four days,[14] during which time they remained in the free port area of the Geneva airport. The mosaics never passed through Swiss customs.

The defendants stress the fact that the money used to finance the purchase of the mosaics passed from Merchants Bank in Indianapolis to Goldberg, *via* a Swiss bank. However, the Swiss bank did not loan Goldberg money, nor does it have any security interest in the transaction. The Swiss bank merely served as a conduit to pass the funds from Merchants in Indianapolis to Goldberg. Defendants also dwell on the fact that the sale was consummated in Switzerland while both the buyer and seller were in that country. However, most of the negotiations for the sale occurred in The Netherlands, not Switzerland. Any contacts Switzerland may have had to the transaction at the heart of this suit were fortuitous and transitory. Switzerland has no significant interest in the application of its law to this suit. For the foregoing reasons, the Court concludes that Switzerland "bears little connection" to this suit; its contacts to this case are insignificant.

After a court has determined that the place where the wrong was committed bears little connection to the legal action, the second step in the *Hubbard* analysis is to apply additional factors to determine which state or jurisdiction has the more significant relationship or contacts. *Hubbard*, 515 N.E.2d at 1074. Among the factors a court may consider are:

(1) the place where the conduct causing the injury occurred;

(2) the residence or place of business of the parties; and

(3) the place where the relationship is centered.

*Id.* at 1073–74; *see also Gollnick v. Gollnick*, 517 N.E.2d 1257, 1058 (Ind.Ct.App. 1988). The Court concludes, after weighing these and other relevant factors, that Indiana has the most significant contacts to this suit. Therefore, Indiana law applies.

Indiana's contacts to this suit are more significant than those of any other jurisdiction. Defendant Peg Goldberg is a citizen of Indiana. Defendant Goldberg & Feldman Fine Arts, Inc. is an Indiana corporation with its principal place of business in Indiana. The purchase of the mosaics was effected largely through the efforts of an Indiana art dealer, Robert Fitzgerald. The purchase of the mosaics was financed by a loan obtained from an Indiana bank, Merchants; Merchants presently holds a security interest in the mosaics in the amount of $1,200,000. Several Indiana residents (Goldberg, Fitzgerald, Dr. Bick, Frenzel) and one Indiana corporation (Merchants) hold an interest in any profits realized on the resale of the mosaics. The original resale agreement among Goldberg, Fitzgerald, van Rijn, and Faulk stipulated that Indiana law would govern any disputes arising out of the agreement. This indicates Goldberg's belief that the laws of her home state, Indiana, were more significant to this transaction. Finally, the mosaics are presently in Indiana and have been in Indiana since they were transported from Geneva in July 1988. For these reasons, Indiana has a significant interest in the application of its law to this transaction. Therefore, the Court concludes that Indiana has the most significant contacts to this suit. Indiana law applies.

## B. Swiss Law Analysis

██ The conclusion that Indiana substantive law applies in this case is bolstered by Swiss choice-of-law principles. As Professor Arthur von Mehren[15] testified at trial:

Mehren testified at trial as an expert witness for the plaintiffs on the subject of Swiss law. In summarizing Swiss law, the Court will cite to the transcript of Professor von Mehren's testimony in lieu of citing directly to the Swiss statutes and treatises upon which Professor von

---

**14.** The mosaics were transported from Munich to Geneva on July 5, 1988, and from Geneva to Indianapolis on July 8, 1988.

**15.** Arthur Taylor von Mehren is Story Professor of Law at Harvard Law School. Professor von

The choice of law rules of another system may assist in certain cases a forum in determining its ultimate choice of the applicable law.... [I]t may be of interest to the forum and of help to the forum in reaching a conclusion to consider what view would be taken by the courts of another legal order if the matter were before those courts.

Tr. 9 (von Mehren). This Court will now examine Swiss choice-of-law principles for whatever light they may shed on the issue of which jurisdiction's substantive law should be applied under the facts of this case. Swiss choice-of-law rules also dictate that Indiana substantive law should control.

As a general rule, Swiss law applies the so-called *lex situs* principle in determining choice-of-law in cases where the ownership of tangible, movable property is disputed. *Id.* at 10. Under the *lex situs* rule, a forum court must apply the substantive law of the place where the tangible, movable property was physically located at the time of its sale. *Id.* If this general rule applies in the present case, then Swiss law governs because the mosaics were physically present in Switzerland when the sale was consummated. However, the general rule does not apply in this case.

Swiss law recognizes an exception to the general *lex situs* rule. As Professor von Mehren explained, under Swiss choice-of-law rules,

> an exception is made for situations in which the goods though physically present, have only a fortuitous and transitory or casual connection with the legal order in question. This is often expressed as the exception for goods in transit.

*Id.* at 10, 11. If a transaction falls within this "in transit" exception, then the law of the situs does not apply; instead, the law

of the place of destination applies.[16] *Id.* at 11. In the case *sub judice*, the place of destination is Indiana. Therefore, if the exception for property in transit applies, then Indiana substantive law governs.

The Court agrees with Professor von Mehren's opinion that the "in transit" exception applies in this case. Id. at 18. The mosaics were transported from Munich to Geneva. Upon their arrival in Geneva, the mosaics were placed in storage in the free port area of the Geneva airport; there they remained in storage for four days until being shipped to Indianapolis. The mosaics never passed through Swiss customs. The mosaics never entered the Swiss stream of commerce. Their presence in Switzerland was temporary, as was intended. Those involved with the transaction intended that if the sale were consummated, the mosaics were to be shipped to Indiana; if not, the mosaics were to be returned to Germany. For the foregoing reasons, the Court concludes that under Swiss law the "in transit" exception to the general *lex situs* rule would apply. Therefore, the law of the place of destination controls, which in this case is Indiana. Accordingly, Swiss choice-of-law rules would agree with this Court's earlier conclusion that Indiana substantive law controls under the facts of this case.

### VI. *Substantive Law*

#### A. Indiana Substantive Law

■ At every appropriate opportunity in their complaint, the plaintiffs request that possession of the mosaics be awarded to the plaintiff Church of Cyprus. Under Indiana law, replevin is the proper legal theory for the recovery of personal property. "A replevin action is a speedy statutory remedy designed to allow one to recover possession of property wrongfully held or detained as well as any damages incidental to the detention. The only issue *necessarily* decided in a replevin action is the

Mehren based his conclusions. The Court is persuaded that Professor von Mehren's testimony is supported by applicable Swiss law.

16. Swiss law is unsettled in this area. The opinion that, under the "in transit" exception, the law of the place of destination controls is, according to Professor von Mehren, "[t]he prevail-

ing rule today." Tr. 11 (von Mehren). Other authorities argue that the law of the place of origin would apply. The Court finds persuasive Professor von Mehren's conclusion that the law of the place of destination controls when the facts of a case fall within the "in transit" exception.

right to present possession." *State Exchange Bank of Culver v. Teague*, 495 N.E.2d 262, 266 (Ind.App.1986) (emphasis in original). Indiana courts have long adhered to this theory.[17] Although the mosaics were originally fixtures, attached to the apse of the Kanakaria Church, they may be replevied as long as their separate identities may be determined. A fixture severed from the real property to which it first attached becomes personal property and may be replevied. I.L.E. Fixtures § 14 (West 1959).[18]

The plaintiffs have requested the return of the mosaics. It is undisputed that the mosaics are significantly important to the Church and Republic of Cyprus. Papageorghiou testified that the mosaics have unique religious and spiritual significance to the Church and Republic of Cyprus. Tr. 84–85. Father Pavlos Maheriotis, Abbot of the Holy Monastery of Machaeras in Cyprus and a senior official and representative of the Archbishop of the Church of Cyprus, testified that the Church of Cyprus wants the mosaics returned because "they are our spiritual treasures. They were once put up on the wall and they were

sanctified through the prayers and through the holy liturgy and they are part of our Christian life." Tr. 263. Dr. Vikan, the plaintiffs' art expert, testified that wall mosaics were the spiritual and artistic manifestation of the Byzantium culture. By lining the walls of sacred places with holy figures, the people of the Byzantine culture "create[d] a kind of sacred space for worship and veneration within that interior." Tr. 337–38. Dr. Vikan further testified that the original Kanakaria mosaic is of even greater significance because only six or seven mosaics survived both the ravages of iconoclasm, in which "images were outlawed and then they were consciously destroyed by imperial edict in Byzantium," and the passage of time. Tr. 338. Because the plaintiffs have requested the return of their uniquely valuable mosaics, the Court considers replevin as the more appropriate characterization of this case, including return of the mosaics as the more appropriate remedy. Therefore the Court will analyze the plaintiffs' claims under the elements of a cause of action for replevin.

In Indiana to prove a claim for replevin, a plaintiff must prove that he has title or

**17.** "[Our] courts have long held the primary purpose of a replevin action is to recover the rightful possession of the property." *Kegerreis v. Auto–Owners Insurance Co.*, 484 N.E.2d 976, 982 (Ind.App.1985) (citations omitted). "Replevin is a possessory action, the gist or purpose of which is to determine the plaintiff's right to the possession of the property which is the object of the action and which the defendant has wrongfully taken or has wrongfully retained.... The primary object is to recover the possession of the property." *Ring v. Ring*, 131 Ind.App. 623, 174 N.E.2d 58, 61 (1961) (citations omitted).

> Replevin is a possessory action. The purpose of an action in replevin is to determine who shall have possession of the property sought to be replevied. Even in causes like the cause at bar, where the plaintiff alleges that he is the owner of the property sought to be replevied and is entitled to the possession thereof, the purpose of the cause is to determine whether or not the plaintiff is entitled to the possession of the property, and it is not the purpose to determine whether the plaintiff is the owner of the property.

*Meyer v. Deifenbach*, 100 Ind.App. 360, 193 N.E. 693 (1935). "[T]he question of possession enters into and becomes the very gist of the action of replevin." *Beatty v. Miller*, 47 Ind.App. 494,

94 N.E. 897, 898 (1911). "[I]n an action to recover the possession of personal property, judgment for the plaintiff may be for the delivery of the property, or the value thereof in case a delivery cannot be had, and damages for the detention." I.L.E. Replevin § 45 (West 1960).

The Court notes that Indiana provides a statutory process for replevin. *See* I.C. § 34–1–9.1–1 *et seq.* However, neither plaintiffs nor defendants have pleaded nor tried the case expressly under these provisions. The parties have tried the case with reference to causes of action for the recovery of personal property as found in Indiana case law. The Court finds it unnecessary to refer to the statutory provisions above in light of its disposition on the merits under Indiana case law.

**18.** For a general discussion of replevin and similar actions, such as claim and delivery, trover, trespass, detinue, and detention, *see generally* 77 C.J.S. Replevin, §§ 1–6 ("Replevin is a possessory action. The property is the subject of the action. The gist of the action is plaintiff's right to immediate possession and the defendant's wrongful taking or wrongful or unlawful detention." *Id.*, § 4; "In the choice of remedies, as between replevin and trover, or trespass, the preference is with the former, in that it restores the property itself." *Id.*, § 6); 66 Am.Jur.2d Replevin, §§ 1–6.

right to ownership, that the property has been unlawfully detained, and that the defendant is in wrongful possession of the property. *Snyder v. International Harvester Credit Corp.*, 147 Ind.App. 364, 261 N.E.2d 71, 73 (1970) (citations omitted); I.L.E. Replevin § 42 (West 1960). The Court now applies the elements of replevin to the facts of this case.

First, the plaintiffs must prove ownership of title or the right to possession of the mosaics. Indiana courts have held that "[i]n a replevin action it is fundamental that the plaintiff must prove his right to possession of the property. He must prove his right to possession on the strength of his own title, not merely the weakness of the defendant's title or right to possession." *Tucker v. Capital City Riggers*, 437 N.E.2d 1048, 1051 (Ind.App.1982) (citations omitted).[19] Both Theodoros Avraam, a former resident of Lythrankomi, and Papageorghiou testified that the mosaics in this case are those from the Kanakaria Church. Tr. 43, 53, 63–68, 82–83, 90. Father Maheriotis testified that the Kanakaria Church is part of the Church of Cyprus. Tr. 262. He identified a document, exhibit 2013, as a Certificate of Registration of Immovable Property by the Land Registry Office of Cyprus. He testified the the certificate indicates that the Kanakaria Church is a part of the Holy Archbishopric of the Church of Cyprus, which fact is duly noted by the seal of the church and the seal of the government. Tr. 262. In addition, Michael Kyprianou, senior counsel of the Republic of Cyprus in the Attorney General's office, testified that the mosaics, as property affixed to the Kanakaria Church, are owned by the Archbishop of the Church of Cyprus. Tr. 284, 302. The defendants presented no witnesses to contradict ownership of the mosaics by the Church of Cyprus. However, in questioning Kypria-

nou, defendants attempted to show that the Kanakaria Church is owned by a monastery. Even assuming this to be true, which the Court does not find as a fact, Kyprianou testified that the monastery is part of the Church of Cyprus as well. The Court concludes that the plaintiffs have presented credible and persuasive evidence that the right to ownership and possession of the mosaics rests with the plaintiff Church of Cyprus, for all times relevant to this litigation.

Second, the plaintiffs must show that the items to be replevied were unlawfully or wrongfully detained. The mosaics were removed from the Kanakaria Church at some point between 1976 and 1979, during the Turkish occupation of northern Cyprus. Father Maheriotis testified that the Church of Cyprus has never authorized anyone to remove the mosaics or to sell anything from the Kanakaria Church. Tr. 261–263. Further, Father Maheriotis testified that the Church of Cyprus does not consider the Kanakaria Church to be abandoned and that, when civil conditions allow, the Church of Cyprus intends to re-establish its congregation at the Church. Papageorghiou testified that the Republic of Cyprus never granted permission to anyone to remove or export the mosaics of the Kanakaria Church. Kyprianou testified that, under the facts of this case, the Church of Cyprus has never lost title to the mosaics even though the Church has not had physical control of the Kanakaria Church since the Turkish occupation of the region. Tr. 285. He further stated that the mosaics were removed and carried away without the consent of the Republic of Cyprus. Tr. 288–89. The defendants presented no credible evidence or persuasive argument that the mosaics were removed in a manner inconsistent with the above evidence.[20]

---

**19.** *See also Hayes v. Harris,* 479 N.E.2d 1359, 1361 (Ind.App.1985) (replevin action requires proof that defendant is in unlawful possession of plaintiff's personal property); *Aircraft Acceptance Corp. v. Jolly,* 141 Ind.App. 515, 230 N.E.2d 446, 449 (1967) (general rule in replevin is that plaintiff must have either a general or special ownership with a right to possession of the property sued for at the time the action is

commenced); *Williams v. Padelinetti,* 73 Ind. App. 216, 127 N.E. 158, 159 (1920) (to recover in replevin plaintiff must prove that he was owner or entitled to possession of item and that defendant had wrongfully taken or detained item).

**20.** Through their evidence the defendants have attempted to show, *inter alia,* that the mosaics were properly exported and that such removal was authorized by Turkish Cypriot officials.

The Court concludes the following: that the Church of Cyprus has never intended to relinquish title to or possession of the mosaics; that the Church of Cyprus has never abandoned the Kanakaria Church or the mosaics; and that the mosaics were improperly removed from the church, without the authorization or permission of the Church of Cyprus or the Republic of Cyprus. For purposes of this opinion, the mosaics were stolen from the church. For these reasons, the Court concludes that the mosaics were unlawfully detained or taken from the rightful possession of the Church of Cyprus.

Finally, to recover under replevin, the plaintiffs must prove that the defendants are in wrongful possession of the mosaics. The defendants concede that the mosaics are in their possession. Thus the issue is whether the defendants' possession of the mosaics is wrongful. As previously noted, the Court has concluded that the mosaics were stolen. There are long established rules of law in Indiana that a thief never obtains title to stolen items, and that one can pass no greater title than one has. *Torian v. McClure*, 83 Ind. 310 (1882); *Breckenridge v. McAfee*, 54 Ind. 141 (1876). Therefore, one who obtains stolen items from a thief never obtains title to or right to possession of the item. *Id.*

In *Breckenridge, supra,* one of the plaintiff's employees wrongfully and without the plaintiff's authorization took the plaintiff's wheat, sold it to defendants, and absconded with the money. The plaintiff sued for the return of the wheat, or if that was impossible, for money damages for the value thereof. At trial a jury returned a verdict for the plaintiff. The Indiana supreme court affirmed the judgment, holding as follows:

> The Court is not persuaded by these attempts. Parenthetically, the Court notes that the Turkish Republic of Northern Cyprus, in its memorandum in support of its motion to intervene in this case, claims that the mosaics are the property of the Turkish Republic of Northern Cyprus and that the mosaics were improperly removed from the church in violation of Turkish Cypriot laws. These assertions cast further doubt on the defendants' claim that export of the mosaics was authorized by Turkish Cypriot officials.

In our opinion, a thief can not [sic] acquire any title to stolen property, by means of a larceny thereof, and can confer no title thereto on his vendees; and this is so, whether the larceny thereof is a larceny at common law, or a larceny thereof as larceny is defined in the modern English and American authorities.

54 Ind. at 149 (1876). This case clearly stands for the proposition, then, that a thief never acquires title to stolen property, and cannot pass any title to any subsequent transferees, including subsequent purchasers.

Similarly, in *Torian, supra,* the thief rented a piano from the plaintiff. The thief then sold the piano to the defendant, a good faith purchaser for value. The plaintiff sued the defendant in replevin for the recovery of the piano. The trial court found for the plaintiff and ordered a return of the piano, or in the alternative money damages, and ordered money damages for the detention of the piano. The Indiana supreme court affirmed the judgment, including this conclusion of law:

> that [the thief], at the time he sold the piano to the defendant, had no title thereto, and could confer none on the defendant, and that the plaintiff is the owner thereof.

83 Ind. at 311 (1882). This case as well stands for the proposition that a thief never acquires title to stolen property, and cannot pass any right to possession of stolen property to a subsequent transferee, including a *bona fide* purchaser for value.[21]

Under Indiana law, as outlined, a thief obtains no title to or right to possession of stolen items and can pass no title or right to possession to a subsequent purchaser.

---

**21.** *See also Shearer v. Evans,* 89 Ind. 400, 403 (1883) (thief cannot confer good title to stolen goods); I.L.E. Conversion § 15 (West 1958) ("If the original conversion was a theft, a purchaser from the thief can generally acquire no title, regardless of his innocence or good faith in making the purchase"). *Accord, O'Keeffe v. Snyder,* 83 N.J. 478, 416 A.2d 862, (1980); *Kunstsammlungen Zu Weimar v. Elicofin,* 536 F.Supp. 829, 833 (E.D.N.Y.1981), *affirmed,* 678 F.2d 1150 (2d Cir.1982).

The mosaics were stolen. For purposes of this analysis, it is of no significance whether Aydin Dikman originally stole the mosaics, or who originally stole them. Further, it matters not whether Goldberg purchased the mosaics from Dikman alone, or from Dikman, van Rijn, and Fitzgerald, or from only van Rijn and Fitzgerald. The evidence of theft and chain of possession under the facts of this case lead only to the conclusion that Goldberg came into posses-

sion of stolen property. Under Indiana law, she never obtained any title or right to possession.[22] Therefore, the Court concludes that the defendants are in wrongful possession of the mosaics.

■ Under Indiana law, the Court concludes that the plaintiffs have made credible and persuasive showings on the elements necessary for the replevin of personal property.[23] The Indiana cases holding

**22.** As shown above, under Indiana law even a *bona fide* purchaser cannot acquire title to or right to possession of stolen property. Therefore, because the Court has concluded that the mosaics were stolen, there is no need to determine whether Goldberg was a *bona fide* purchaser under Indiana law.

The Court notes that in some situations a "middleman," for lack of a better term, may obtain voidable title and pass good title to a *bona fide* purchaser for value without notice of the original ownership. One who induces the original owner by fraudulent representations to sell an item acquires voidable title to the item. A *bona fide* purchaser for value, without notice of the original ownership, may acquire good title to the item from the middleman. Boyer, *Survey of the Law of Property,* 712–15 (1981). As between the original owner whose property is stolen and the *bona fide* purchaser who acquires the stolen item from a thief, the law will protect the original owner, because he did nothing and evidenced no intent to part with title to his property. As between an original owner who intentionally relinquished title to his property (albeit under fraudulent circumstances) and the *bona fide* purchaser from a fraudulent middleman, however, the law will protect the *bona fide* purchaser. The original owner lost his protection, ostensibly, when he parted with title to his property.

There is some indication that Indiana follows the voidable title rule. *Alexander v. Swackhamer,* 4 N.E. 433, 436 (Ind.1886); *Breckenridge v. McAfee, supra,* 54 Ind. at 147. However, it is not necessary to apply this analysis to the facts of this case because there is absolutely no evidence that the plaintiffs ever intended to part with title to or possession of the mosaics by sale, export, fraudulent relinquishment of title, or otherwise. As a matter of law no one in the chain of possession of the mosaics ever obtained voidable title; thus Goldberg could not be a *bona fide* purchaser under this analysis.

**23.** At some points counsel have referred to this case in a conversion context. This Court notes that Indiana recognizes the tort of conversion. Indiana courts have held that the "essence of every conversion is the wrongful invasion of a right to, and absolute dominion over property owned or controlled by the person deprived

thereof, or of its use and benefit ... the essential elements to be proved are 'an immediate, unqualified right to possession resting on a superior claim of title'.... 'In actions for conversion, it is necessary for the plaintiff to show that before or at the time of the conversion, he had title, either general or special, to the property in controversy, coupled with the right of immediate possession, and that the property had been wrongfully converted by the defendant to his own use.'" *Noble v. Moistner,* 180 Ind.App. 414, 388 N.E.2d 620, 621 (1979). *See also Indiana & Michigan Electric Co. v. Terre Haute Industries, Inc.,* 507 N.E.2d 588, 610 (Ind.App.1987) (elements of conversion); *Howard Dodge & Sons, Inc. v. Finn,* 181 Ind.App. 209, 391 N.E.2d 638, 640 (1979) (elements of conversion). The intent to convert one's property is not an essential element. *Howard Dodge & Sons, supra,* 391 N.E.2d at 641; *Burras v. Canal Construction and Design Co.,* 470 N.E.2d 1362, 1368 (Ind.App. 1984).

The general rule in Indiana is that in an action for conversion, the owner does not seek return of the property, but only money damages for its value, *Plymouth Fertilizer Co., Inc. v. Palmer,* 488 N.E.2d 1129, 1130 (Ind.App.1986), although one Indiana court has held that conversion is "cured" by the payment of damages or the return of the property, *Chesterton State Bank v. Coffey,* 454 N.E.2d 1233, 1237 (Ind.App. 1983). Further, in Indiana actions for conversion are governed by a two-year statute of limitations. *French v. Hikman Moving & Storage,* 400 N.E.2d 1384, 1388 (Ind.App.1980) (citation omitted). One Indiana court has noted that a two-year statute of limitation for conversion is "an anomaly" when compared to the six-year statute of limitations which applies to an action to recover personal property. *Rush v. Leiter,* 149 Ind.App. 274, 271 N.E.2d 505, 508 (1971). The *Rush* court also noted that at common law the tort of conversion had two remedies, trover, which resulted in a forced judicial sale of the property, and replevin, which resulted in recovery of the specific items. 271 N.E.2d at 508. As this Court has previously stated, possession of the mosaics is the more appropriate remedy in this case, and replevin is the more appropriate characterization of the case.

The Court notes that the elements necessary to prove conversion are very similar if not iden-

that a thief obtains no title to stolen property recognize a long-standing rule. The cases establish law which increases in precedental value over time. As the plaintiffs have proven their case for replevin, the Court concludes that possession of the mosaics must be awarded to the plaintiff Church of Cyprus.

**B. Swiss Substantive Law**

■ Assuming, *arguendo*, that Indiana substantive law does not apply in this case, the Court next considers the issues under Swiss law. Under Swiss law, a purchaser of stolen property acquires title superior to that of the original owner only if he purchases the property in good faith. Tr. 19 (von Mehren). A bad faith purchaser of stolen property never acquires title. *Id.* at 20. As Professor von Mehren explained at trial, to conclude that a purchaser did not act in good faith, a court must *either* find that the purchaser actually knew that the seller lacked title, *or* find that "an honest and careful purchaser in the particular circumstances would have [had] doubts with respect to the capacity of the seller to transfer property rights." *Id.* at 24.

Swiss law presumes that a purchaser acts in good faith. *Id.* at 26. However, a plaintiff seeking to reclaim stolen property may overcome this presumption. *Id.* To do so he must show that suspicious circumstances surrounded the transaction which should have caused an honest and reasonably prudent purchaser to doubt the seller's capacity to convey property rights. *Id.* If the plaintiff shows that the circumstances surrounding the transaction should have created such doubt, then the defendant purchaser has the burden of establishing his good faith. A purchaser establishes his good faith by showing that he took steps to inquire into the seller's capacity to convey

property rights and that such steps reasonably resolved such doubt. *Id.*

**1. *Suspicious Circumstances***

As previously set forth, under Swiss law, this Court must begin its analysis by presuming that Goldberg purchased the mosaics in good faith. The plaintiffs argue that they have overcome this presumption by showing that suspicious circumstances surrounded the sale of the mosaics sufficient to cause an honest and reasonably prudent purchaser in Goldberg's position to doubt whether Dikman had the capacity to convey property rights. Therefore, plaintiffs contend, Goldberg cannot rest on the presumption that she purchased the mosaics in good faith. The Court agrees.

Many suspicious circumstances surrounded the sale of the mosaics. First, Goldberg knew the mosaics came from an area occupied by foreign military forces. Goldberg testified that at the time of the sale she was aware that Turkish military forces had invaded Cyprus in 1974 and that the Turks have been in control of northern Cyprus since that time. Tr. 460. She was told by Michel van Rijn that the mosaics had been "found" by the seller in the rubble of an "extinct" church in northern Cyprus and that the church had been damaged during the Turkish invasion. Tr. 469–70. Goldberg herself admitted on direct examination that the origin of the mosaics raised suspicions in her mind:

Q. I believe you said that Mr. van Rijn told you these mosaics were from Cyprus. Did that set off any warning bells in your mind?

A. Well, yes. I mean, I knew that Cyprus had been a British colony for a number of years. I knew that the island had changed hands, or parts

---

tical to those necessary to prove an action for replevin. This Court believes that under Indiana law, the cause of action for replevin stands on its own, and proof of a conversion is not a predicate to recovery in replevin. However, to the extent it may be necessary to support the decision reached herein, the Court concludes that the plaintiffs have also proven the elements of a conversion. The plaintiffs' claim for conversion accrued when the defendants

obtained possession of the mosaics in July, 1988, *see Lee Tool & Mould, Ltd. v. Fort Wayne Parts, Inc.,* 791 F.2d 605, 608–09 (7th Cir.1986), and thus the plaintiffs' filing of their complaint in March 1989 was properly within the two-year statute of limitations for actions for conversion.

However, the Court states expressly that any rule or conclusion of law regarding conversion notwithstanding, the Court is of the firm belief that replevin and possession of the mosaics is

of it had changed hands many times, and I did know that at least for the last 14 or 15 years the island had been divided.

Tr. 459–60.

Second, the very nature of the items for sale warranted that a potential purchaser should proceed with caution. As Professor von Mehren explained:

Here we have not an ordinary object, nor do we have an object that is typical movable property. Instead we have mosaics that are unique, that have great cultural and artistic value, that have also great economic value. These mosaics were, up until very recently, not movable property at all. They were part of a building. They were immovable property. When one has an object that was not movable property and it then is turned into movable property and appeared on the market and is of great and unique value, the circumstances require an explanation as to how that came about. Was this a legitimate series of events, or not?

In addition, these objects are not ordinary commercial objects. They are objects that have religious and cultural significance. They are the kind of objects that do not ordinarily enter into commerce, and here they are in commerce, or being offered for sale. A careful and honest purchaser would have to understand and explain why ... these mosaics should now be offered on the market.

Tr. 27–28 (von Mehren).

Third, a vast disparity existed between the appraised value of the mosaics and the price Goldberg paid for them. Goldberg paid $1.08 million, in cash, for the mosaics; six months later, she offered to sell them to the Getty Museum for $20 million.[24] Exhibit 52. Prior to her purchase of the

mosaics, Goldberg received an appraisal of their value from van Rijn. He valued the mosaics at approximately $1.2 million for each of the three smaller pieces and approximately $2.4 million for the mosaic depicting Christ, or a total of $6 million for all four mosaics. Exhibit 43. Art dealer Robert Roozemond appraised the value of the mosaics at two million pounds, or approximately $4 million. Exhibit 44. Robert Fitzgerald, an art dealer with 28 years experience, valued the mosaics at $3 to $5 million. Tr. 316. The defendants' art expert, Andre Emmerich,[25] estimated the market value of the mosaics to be between $5 and $6 million. Emmerich Deposition 81.

Fourth, Goldberg knew very little about the seller, Aydin Dikman.[26] Everything she knew about Dikman she learned from middlemen: Fitzgerald, van Rijn, and Faulk. She was told that Dikman was a Moslem Turk attempting to sell Christian mosaics from northern Cyprus. She was also told that Dikman "found" the mosaics while he was employed as "an archaeologist from Turkey assigned to northern Cyprus." Tr. at 456. The Court believes that a reasonable purchaser would have found it peculiar that a Turkish archaeologist would be in the business of selling Cypriot antiquities. As the plaintiffs' art expert Dr. Vikan testified:

the one thing that really strikes me about this as being strange is that he [Dikman] is an archaeologist. This is a good thing, I guess, but when in the world did archaeologists get in the business of selling antiquities? I mean this is bizarre.

Tr. 350. In addition, Goldberg met the seller, Dikman, only once.[27] That brief

the more appropriate characterization of and remedy for this case.

24. Goldberg testified that, upon seeing photographs of the mosaics for the first time, she "fell in love" with them. Tr. 447. The fact that she quickly offered the mosaics for sale for $20 million discredits her prior testimony.

25. Andre Emmerich is an art dealer and the owner of Andre Emmerich Gallery, Inc., New York, New York.

26. Goldberg was not told the identity of the seller at her initial meeting with van Rijn and Fitzgerald on July 1, 1988. It was not until July 3rd that she was told the seller was a man named Aydin Dikman.

27. Goldberg testified that on July 5, 1988, she met Faulk and Dikman in the free port area of the Geneva airport for the purpose of inspecting the mosaics. The meeting between Goldberg and Dikman was fleeting and proved une-

meeting occurred on July 5, 1988, or two days before the sale was consummated. This was the only time Goldberg and Dikman ever communicated directly with each other. Finally, as previously discussed, no document such as a bill of sale or export paper links *Dikman* to these mosaics.

Fifth, the cast of characters acting as middlemen, namely, Michel van Rijn, Ronald Faulk, and Robert Fitzgerald, were themselves suspect. Goldberg knew very little about Michel van Rijn; she first met him on July 1, 1988, or six days before the sale was consummated. She did know, however, that he was a felon. Goldberg testified that at the time of the sale she knew van Rijn had been convicted in France for art forgery. She also knew that van Rijn was being sued by an art gallery for "[f]ailure to pay money." Next, Goldberg knew very little about Ronald Faulk. She knew only that he was an attorney from California and that he was representing Fitzgerald and van Rijn in this transaction.[28] Goldberg was, however, familiar with Robert Fitzgerald, the principal middleman. She "had known him casually for several years." Tr. 533. She knew, for example, that in the past Fitzgerald had used the names Robert Jones, Robert Jones–Fitzgerald, and Robert Fitzgerald–Jones. Tr. 533. She also knew that Fitzgerald had been sued for his involvement in a transaction involving a purported Michelangelo modello. Tr. 323–24, 433–35. In addition, Goldberg knew that all three middlemen were to profit financially from the sale of the mosaics.

Finally, the haste with which the transaction was carried out raises suspicions. Goldberg first learned of the mosaics on July 1, 1988. On July 4th, she signed a contract with the three middlemen to divide the mosaics' resale profits. Later on July 4th Goldberg traveled from Amsterdam to Geneva. There she inspected the mosaics on July 5th. The sale was consummated on July 7th. On July 8th, the mosaics were on an airplane to the United States. The rush with which this sale took place raises suspicions. As Dr. Vikan testified:

> The timing of the sale [raises suspicions]. July 2nd [to] July 7th. What is the big hurry? These things have been in somebody's warehouse in Munich for ten years, nine years. Why such a hurry now? If you are in such a hurry why not put a good faith deposit down, why not put your funds in escrow, why not write a contract with the contingency this contract will go into effect on the 1st of September with the delivery of all funds contingent on the satisfactory resolution of provenance, authenticity, and restorability....

Tr. 352.

All of the foregoing sets of circumstances, especially when considered together, raise significant suspicions. For these reasons, the Court concludes that suspicious circumstances surrounded this sale sufficient to cause an honest and reasonably prudent purchaser in Goldberg's position to doubt Dikman's capacity to convey property rights to the mosaics. The Court cannot improve on Dr. Vikan's summation of the suspicious circumstances surrounding this sale: "All the red flags are up, all the red lights are on, all the sirens are blaring." Tr. 353. Because such suspicious circumstances existed, Goldberg cannot rest on the presumption, which she is afforded under Swiss law, that she purchased the mosaics in good faith. Instead, Goldberg now bears the burden of establishing her good faith. She may do so by showing that she took steps to inquire into Dikman's capacity to convey property rights to the mosaics

---

ventful, as described in the following excerpt from Goldberg's testimony at trial:
Q. What did you say to him [Dikman] and what did he say to you?
A. Well, that is about what it was. I had prepared a list of things that, if possible, to talk about. But I introduced myself and he introduced himself and we shook hands and the crates containing the mosaics were opened and he left.

Q. Did you perceive that he was—whether or not he was fluent in English?
A. I don't think so.
Tr. 484. Attorney Faulk does not remember this meeting between Goldberg and Dikman and is not sure whether they ever met in person. Faulk Deposition 228.

28. Attorney Faulk did not represent, nor claim to represent, Goldberg in this transaction.

and that such steps reasonably resolved any doubts as to Dikman's capacity to convey such property rights.

### 2. *Goldberg's Inquiry*

Next, the Court will examine the steps Goldberg took to inquire into Dikman's capacity to convey property rights to the mosaics. As a prefatory matter, the Court notes that all of Goldberg's inquiries took place *after* July 4, 1988, which is the date she signed an agreement with the middlemen to split the profits from any future resale of the mosaics.

Goldberg testified that she telephoned authorities at UNESCO's office in Geneva. She cannot recall the name of any individual she spoke with at UNESCO, Switzerland. Goldberg testified that the purpose of her call was to determine "whether or not there were any applicable treaties which would have covered the removal of the items from northern Cyprus in the mid to late 1970s to Germany." Tr. 497. Thus, Goldberg inquired about treaties, not about the mosaics. She did not inquire as to whether the mosaics had been reported as stolen or whether existing claims might exist. In fact, she did not mention the mosaics at all. Further, Goldberg did not contact UNESCO's office in Paris, which is UNESCO's "central gathering point" for information concerning art and cultural property. Emmerich Depo. at 73.

Goldberg also testified that she telephoned the International Foundation for Art Research (IFAR) in New York. IFAR is an international organization that collects information concerning stolen art. Goldberg does not recall the name of any individual she spoke with at IFAR. No document sent to or received by IFAR confirms Goldberg's telephone call. IFAR has no record of Goldberg's alleged telephone call in July 1988. IFAR has a procedure whereby a formal search can be made of its files to determine whether a particular work of art has been listed as missing or stolen. Lowenthal Deposition 17. The cost is $25, which is billed to the requesting party. *Id.* Goldberg did not request that such a formal search be conducted, nor was she billed for any informal search IFAR may have conducted of its files in July 1988.

Next, Goldberg testified that she telephoned customs offices in the United States, Switzerland, Germany, and Turkey. She cannot recall, however, the name of any person she allegedly contacted at any of these customs offices. She testified that she asked whether the mosaics had been reported as missing or stolen. Tr. 493–97. Her testimony is not corroborated by a single document sent to or received from any such customs office. In addition, on December 18, 1988, Goldberg prepared "an outline" of "the steps that we [Goldberg and Feldman] took and the knowledge we had of the pieces." Tr. 567. No mention is made in this outline of any calls placed to or contacts made with U.S., Swiss, German, or Turkish Customs.

Next, the Court will examine briefly the steps Goldberg failed to take in determining whether Dikman had the capacity to transfer property rights to the mosaics. First, and most significantly, Goldberg never contacted the Republic of Cyprus or the Church of Cyprus, even though she was told the mosaics came from an "extinct" church in northern Cyprus. Contacting Cyprus is the first logical and necessary step a potential purchaser should have taken to determine the provenance of the mosaics. The importance of contacting Cyprus was highlighted by Dr. Vikan during his direct examination:

Q. Assuming that a prudent person did not want to walk away from this transaction, what, if anything, should that person have done to pursue the transaction?

A. Call the Republic of Cyprus, the only thing you can do.

Q. And why, in your view, is that the only thing you can do?

A. Because the object is [from] there. I'll use the metaphor of the smelly fish. The smelly fish is lying in front of you and it ha[s] Cyprus written on [its] side. The only way you can lift that is to get in touch

with the people who can tell you the truth.

Tr. 353.

Second, Goldberg never contacted the so-called Turkish Republic of Northern Cyprus, formerly known as the Turkish Federated State of Cyprus, even though she was told that the seller, Dikman, discovered the mosaics while he was working as "an archaeologist from Turkey assigned to northern Cyprus." Goldberg later refers to Dikman as "the official archaeologist for the northern one-third of Cyprus, known as the Turkish Federated Republic of Cyprus." Exhibit 12. By contacting the Turkish Republic of Northern Cyprus, Goldberg could have verified whether Dikman had ever served as the "official archaeologist" of that country and whether the mosaics had ever been exported properly from northern Cyprus.

Third, Goldberg failed to contact Interpol, the international police organization headquartered in France, to investigate whether the mosaics had been reported as stolen. In light of this, the defendants' point that plaintiffs failed to report the theft of the mosaics to Interpol is of little significance.

Finally, Goldberg did not consult a single disinterested expert on Byzantine art prior to purchasing the mosaics. Goldberg is not, nor does she claim to be, an expert in Byzantine art. Rather, she deals almost exclusively in 19th and 20th century American and European paintings, etchings, and sculptures. Art dealer Barbara Divver suggested to Goldberg that she seek independent, expert advice from one familiar with Byzantine art, but Goldberg failed to do so. Even defendants' own art expert, Andre Emmerich, testified that an art dealer should secure expert advice before venturing into areas in which he is not expert. Emmerich Deposition 57–61.

As the foregoing discussions indicate, Goldberg made only a cursory inquiry into the suspicious circumstances surrounding the sale of the mosaics. Further, the Court has noted additional steps that Goldberg utterly failed to undertake. Therefore, the Court concludes that Goldberg's inquiry was deficient in resolving doubts as to Dikman's capacity to convey property rights to the mosaics.

In summary, the Court concludes that suspicious circumstances surrounded the sale of the mosaics which should have caused an honest and reasonably prudent purchaser to doubt whether Dikman had the capacity to convey property rights. Further, the Court concludes that Goldberg, in making only a cursory inquiry into Dikman's capacity to convey property rights to the mosaics, failed to take reasonable steps to resolve that doubt. Goldberg did not purchase the mosaics in good faith.

### Conclusion

Regarding issues of credibility in this case, the Court finds that the evidence and testimony of the plaintiffs is more credible and persuasive. Indeed, in many instances the manner in which the defendants and associated individuals proceeded in this case reflects negatively on the credibility of the defendants' case.

As previously discussed, under Indiana law and in the alternative under Swiss law, defendant Goldberg never obtained good title to or any right to possession of the mosaics. The plaintiffs have made a proper showing in all respects for the return of the mosaics. The Court concludes that under the circumstances of this case, possession of the property at issue, and not money damages in lieu of return of the actual property, is the more appropriate remedy. Accordingly, the Court orders that the mosaics must be returned to the true and rightful owner, the Church of Cyprus.

The Court notes that damages may be awarded for the loss of the use of the property in a replevin action. *Lou Leventhal Auto Co., Inc. v. Munns*, 164 Ind.App. 368, 328 N.E.2d 734 (1975). Before trial, the issue of damages was separated from the issue of rightful possession of the mosaics. Issues of potential damages and other counts in the plaintiffs' complaint remain. For purposes of determining issues such as damages, remaining claims, and custody or transfer of the mosaics, the Court will address these matters as neces-

sary in such further proceedings as might be required.

## ORDER

This case came before the Court for trial to determine possession of the mosaics at issue in this case. Whereupon the Court, having heard and reviewed the evidence and having reviewed the briefs and submissions of counsel, and being duly advised in the premises, hereby concludes that possession of the mosaics should be awarded to the plaintiff, the Autocephalous Greek–Orthodox Church of Cyprus.

THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED that possession of the mosaics at issue in this case is awarded to the plaintiff, the Autocephalous Greek–Orthodox Church of Cyprus.

IT IS SO ORDERED.